## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JACQUELINE D. BERRY,   :
           :
    Plaintiff,   :
           :
  v.       :  C.A.No. 06-217-GMS
           :
STATE OF DELAWARE,   :
DIVISION OF CHILD SUPPORT, :
           :
    Defendant.  :

## DEFENDANT'S OPENING BRIEF IN SUPPORT

## OF SUMMARY JUDGMENT

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

Marc P. Niedzielski (# 2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)  577-8400

DATED: May 2, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................3

NATURE AND STAGE OF PROCEEDINGS ..................................................................4

SUMMARY OF THE ARGUMENT ..................................................................................5

STATEMENT OF THE FACTS .........................................................................................6

## ARGUMENT I.

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS UNDER THE ADA AS THE CLAIMS ARE BARRED BY THE ELEVENTH AMENDMENT TO THE CONSTITUTION ....................................................................................8

## ARGUMENT II.

PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION OR RETALIATION UNDER TITLE VII OR THE EQUAL PAY ACT ...............................................................................................11


CONCLUSION .................................................................................................................14

# TABLE OF AUTHORITIES

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................................................9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................8

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) .....................................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................8

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................................10

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974).............................................13

*Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994) ....................................................11, 12

*Hampton v. Borough of Tinton Falls Police Dept.*,98 F.3d 107 (3d Cir. 1996) ...........9

*Jones v. Wilmington*, 2004 WL 1534778 (D.Del. June 14, 2004) ..............................12

*Lavia v. Pennsylvania Department of Corrections*, 224 F.3d 190 (3d Cir. 2000).......10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................9

*McDonnell-Douglas v. Green*, 411 U.S. 792 (1973) ...................................................11

*Sheridan  v. DuPont*, 100 F.3d 1061 (3d Cir. 1996).....................................................12

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).............................................12

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 (1981) ..........................11

*Waldron v. SL Industries*, 56 F.3d 491 (3d Cir. 1995)................................................11

Statutes and Other Authorities

Eleventh Amendment of the United States Constitution ......................................*passim*

Fourteenth Amendment of the United States Constitution ..........................................10

29 U.S.C. § 206(d)(1)...................................................................................................13

42 U.S.C. § 12203 ........................................................................................................10

Fed. R. Civ. P. 56(c)......................................................................................................8

## NATURE AND STAGE OF THE PROCEEDINGS

On March 31, 2006, plaintiff commenced this *pro se* action by filing a complaint. (D.I. 1) On May 12, 2006, a summons was issued against the State of Delaware Division of Child Support.

On June 19, 2006, defendant answered the complaint and asserted a number of defenses. (D.I. 5)

On August 1, 2006, plaintiff was permitted to amend her complaint and on August 4, 2006, defendant filed an answer to the amended complaint. (D.I. 7, 9)

On August 30, 2006, the Court entered a Scheduling Order. (D.I. 10)

On September 5, 2006, defendant filed and served interrogatories and request for production. (D.I. 11,12)

On October 30, 2006, plaintiff requested an extension of time from the Court to answer defendant's discovery. (D.I. 14)

On January 17, 2007, defense counsel wrote to plaintiff regarding the outstanding discovery. (D.I. 17)

On February 28, 2007, the plaintiff was deposed. (D.I. 18)

On March 9, 2007, defendant moved for an extension of discovery and to convene a telephone conference.

On May 2, 2007, defendant moved for summary judgment in accordance with the Scheduling Order and this is its Opening Brief.

## SUMMARY OF THE ARGUMENT

### I.

Plaintiff's claims under the ADA are barred by the Eleventh Amendment of the United States Constitution which divests the Court of jurisdiction of lawsuits by citizens against a State.

### II.

To the extent plaintiff states a legal claim for racial discrimination and retaliation under Title VII, the record is devoid of sufficient evidence for the matter to go forward.

## STATEMENT OF THE FACTS

The plaintiff commenced employment with the State of Delaware in 1977 and has been employed with the State in a number of different positions until she resigned in August 2005. (Berry 9, 63)  She started at the Stokely Center in Georgetown and worked as a Certified Nursing Assistant. Then she worked at the Hospital for the Chronically Ill in Smyrna, Delaware. (Berry Tr. 16-17)  In 2000, she started her employment with the Division of Child Support Enforcement in the position of Child Support Specialist ["CSS"] in the Consumer Service Unit. (Berry Tr.18-19) However, during the period 1977 until 2005, plaintiff was only continuously employed with the State for 11 years, 1 month and 15 days. (Berry Tr. 63-64)

The position of CSS requires the employee to answer the phone and type on a computer keyboard the entire work day.  The telephone calls come from non-custodial parents who are being forced to pay child support and the custodial parents who are supposed to be receiving the child support.  (Berry Tr. 20-21) There is only a single location for the Consumer Service unit which is in New Castle County. (Berry Tr. 19)

In 2003, plaintiff transferred to a case worker unit in Sussex County and then transferred back to New Castle County 8 months later to rejoin the Consumer Service Unit as a CSS.  (Berry Tr. 75)

In June 2004, the plaintiff was out of work due to bilateral carpel tunnel syndrome and female problems.  (Berry Tr. 66)  On November 8, 2004, plaintiff

was released by her treating physician to return to work, but with restrictions that preclude her work as a CSS in the Consumer Service Unit. (Charge of Discrimination, January 12, 2005)

On January 12, 2005, plaintiff filed a Charge of Discrimination with the Delaware Department of Labor.  (Berry Tr. 48)

In June 2005, Plaintiff was provided an alternative duty assignment for two months in the tax intercept unit.  (Berry Tr. 97)

In June, 2005, plaintiff applied for a State disability which was denied. (Berry Tr. 62-63)

On August 15, 2005, plaintiff called an office in DHSS to inform staff that she had resigned her employment and had been employed by the North Carolina Division of Child Support Enforcement. (Berry Tr. 9, 73-74)

During her employment with DCSE, plaintiff missed a lot of time from work and had problems with others due to her work attitude. (Declaration of Charles E. Hayward, Director)

## ARGUMENT I.

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS UNDER THE ADA AS THE CLAIMS ARE BARRED BY THE ELEVENTH AMENDMENT TO THE CONSTITUTION.

### Introduction:

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is one that "may reasonably be resolved in favor of either Party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986). The moving party bears the initial burden of demonstrating the absence of material issues of fact. *Celotex Corp.*, at 323. However, the moving party need not support its motion with affidavits or other documents disproving the nonmoving party's claim, but need only "show - - that is point out to the district court - - that there is an absence of evidence to support the nonmoving party's case." *Id.*, at 325. The nonmoving party must go beyond the pleadings and through affidavits or other evidence demonstrate the existence of a genuine issue of material fact. *Id.*, at 314. The district court is

required to construe the evidentiary record so as to give the nonmoving party reasonable factual inferences. *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). Summary judgment should be granted if the court finds, in consideration of all of the evidence, that no reasonable trier of fact could find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

For the reasons that follow, the defendant is entitled to judgment as a matter of law as to plaintiff's claim of any violation of the Americans with Disability Act ["ADA"]. (complaint ¶ 10, D.I. 1)

### (a)    The Eleventh Amendment:

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Supreme Court in describing the immunity of states from suit observed that "Eleventh Amendment immunity ... is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). Instead, "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today except as altered by the plan of the Convention or certain constitutional Amendments." *Id.*

Congress's sole constitutional authority to subject States to suit by individuals must arise under section 5 of the Fourteenth Amendment and not its Article I powers[1]. *Board of Trustees v. Garrett*, 531 U.S. 356, 364 (2001)[striking claims under the ADA against the States. The legislative enactment waiving the State's immunity must be remedial, congruent and proportional "to the injury to be prevented and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)[striking claims under the Religious Rights Restoration Act against state actors]. Since classifications regarding the disabled need only have a rational basis to comport with the equal protection clause of the Fourteenth Amendment, it is clear that the ADA is not "enforcing" that Amendment nor is the ADA remedial, congruent or proportional. *Garrett*, 531 U.S. at 374; *Lavia v. Pennsylvania Department of Corrections*, 224 F.3d 190 (3d Cir. 2000)[ADA Title I).

Accordingly, Congress lacks the authority to subject Delaware to the ADA and defendant is entitled to judgment in its favor. For the same reason all of plaintiff's claims under 42 U.S.C. § 12203(retaliation under the ADA) are barred by Eleventh Amendment immunity.

---

[1] Since the Eleventh Amendment was enacted after Article I of the Constitution.

# ARGUMENT II.

PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION OR RETAILATION UNDER TITLE VII OR THE EQUAL PAY ACT.

## (a) Race Discrimination

The legal analysis for a discrimination claim under Title VII is well-settled. Since plaintiff has not identified any direct evidence of discrimination, he must establish a prima facie case as set forth under *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* analysis, a plaintiff may rely upon indirect evidence that race was a motivating factor in an employment action. The plaintiff must produce evidence that (1) he is a member of a protected class, that (2) he was qualified for the position at issue, and that (3) any adverse employment action for the position was "under circumstances that give rise to an inference of unlawful discrimination." *Waldron v. SL Industries*, 56 F.3d 491, 494 (3d Cir. 1995) (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Upon the plaintiff's production of evidence to establish this prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the purported adverse action. *McDonnell-Douglas v. Green*, 411 U.S. 792, 802 (1973). The defendant is free to articulate any legitimate reason for the purported adverse action; he does not need to show that the articulated reason motivated the purported adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant has articulated that reason, the burden shifts back to the

plaintiff, who must prove that the reason the defendant articulated was a pretext and that the purported adverse action was in fact racially motivated. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512 (1993). A plaintiff may withstand a motion for summary judgment only if the plaintiff is able to point to some evidence, direct or circumspect, from which a fact-finder could reasonably either disbelieve the defendant's articulated legitimate reason for the purported adverse action or believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the purported adverse action. *Fuentes v. Perskie*, 32 F.3d at 764; *Sheridan v. DuPont*, 100 F.3d 1061, 1067 (3d Cir. 1996). A plaintiff may not rely upon evidence that members of the protected class were generally treated differently; such generalizations are not relevant to the question whether others not in the protected class were treated more favorably. *Jones v. Wilmington*, 2004 WL 1534778 at * 5, n.8 (D.Del. June 14, 2004).

In the present matter defendant concedes that plaintiff is in a protected class, however plaintiff has failed to identify any adverse employment action or retaliation due to commencing the EEOC administrative proceedings in January 2005. Plaintiff does complain about one of her two supervisors, a Brenda Annand. Plaintiff testified that she does not like these supervisor's interpersonal skills. However, she does not evince an adverse employment action. To the contrary, plaintiff testified that she voluntarily resigned from DCSE on August 15, 2005 to take another position with the North Carolina Division of Child Support Enforcement. (Berry Tr. 6-9)

There is no factual basis for the Title VII claims and defendant is entitled to judgment.

**(b)    Equal Pay Act**

In plaintiff's complaint, she alleges a claim under the Equal Pay Act. (Complaint ¶ 10, D.I. 1)  However, there is no evidence of wage difference between male and female employees in the Child Support Specialist position at DCSE and therefore plaintiff has failed to establish a prima facie case under the Equal Pay Act. 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

Defendant is entitled to judgment under the Equal Pay Act.

## <u>CONCLUSION</u>

For the above reasons, the defendant is entitled to judgment pursuant to Rule 56(c) as matter of law on the complaint or amended complaint.


Respectfully submitted,

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


<u>/s/ Marc P. Niedzielski</u>
Marc P. Niedzielski (#2616)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8324
Attorney for Defendant

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JACQUELINE D. BERRY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. 06-217-GMS |
| | : | |
| STATE OF DELAWARE, | : | |
| DIVISION OF CHILD SUPPORT, | : | |
| | : | |
| Defendant. | : | |

**CERTIFICATE OF MAILING AND/OR DELIVERY**

The undersigned certifies that on May 2, 2007, he caused the attached document

to be delivered to the following person postage prepaid via First Class Mail:


NAME AND ADDRESS OF RECIPIENT(S):

Jacqueline D. Berry
20 Hickory Lane
Dover, DE 19904

                                        /s/ Marc P. Niedzielski
                                        Marc P. Niedzielski, I.D. No. 2616
                                        Deputy Attorney General
                                        Carvel State Office Building
                                        820 N. French Street, 6th Floor
                                        Wilmington, DE  19801
                                        (302)577-8400
                                        Attorney for Defendant

- 15 -

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 170-2005-00401 |

| DELAWARE DEPARTMENT OF LABOR (DDOL) | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Jacqueline D. Berry** | **(302) 697-9120** | **05/31/1956** |

| Street Address | City, State and ZIP Code |
|---|---|
| **20 Hickory Lane Dover, DE 19904** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **DEL. DIVISION OF CHILD SUPPORT** | **500 or More** | **(302)326-6024** |

| Street Address | City, State and ZIP Code | | |
|---|---|---|---|
| **P. O. Box 904,  New Castle, DE 19720** | | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER *(Specify below.)* | Earliest **03-01-2004**  Latest **11-16-2004**<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**In or about August, 2000 I was hired by Respondent as a Child Support Specialist I. During my employment with Respondent I always received good performance reviews and no disciplinary actions.**

**Recently, I had surgery for carpal tunnel syndrome in both hands and also a hysterectomy for prolonged bleeding. I was out of work since June 2004. Respondent denied me a reasonable accommodation for my disability and then discharged me from my position for not returning to work in September 2004. My doctor released me to return to work on November 8. Respondent then told me that I could not return unless I had no restrictions. Thereafter, I went to the Human Resources Department to report these discriminatory actions. Subsequently, Respondent retaliated against me in the following manner (but not limited to): 1. Issuing me an unfavorable performance evaluation. 2. Denying me a transfer to another department to accommodate my disability. 3. Denial to a ladder increase. To the best of my knowledge, other non-Black co-workers (Deborah Flora and Beth Arnold), have been treated better than I.** 4. HARRASSMENT DUE to USING FMLA LEAVE. (DWA OR 4 of 2 3

**I believe that I have been discriminated against because of my race (Black), retaliation, and disability, in violation of Title VII of the Civil Rights Act of 1964 and the Americans With Disability Act of 1990 (ADA) in that Respondent subjected me with the above mentioned.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT    **Received** |
| **Jan 12, 2005**<br>Date    *Jacqueline D. Berry*<br>Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year )*    **MAY 2 6 2005** |

NCC/Human Resources



**WILCOX & FETZER LTD.**

In the Matter Of:

# Berry

## v.

# State of Delaware, Division of Child Support

### C.A. # 06-217-GMS

Transcript of:

Jacqueline D. Berry

February 28, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

IN THE UNITED STATES DISTRICT COURT
IN THE DISTRICT OF DELAWARE

JACQUELINE D. BERRY,                )
                                    )
            Plaintiff;              )
                                    )   Civil Action No.
v.                                  )   06-217-GMS
                                    )
STATE OF DELAWARE,                  )
DIVISION OF CHILD SUPPORT,          )
                                    )
            Defendant.              )

            Deposition of JACQUELINE D. BERRY taken
pursuant to notice at the Department of Justice,
Carvel State Office Building, 820 North French Street,
Wilmington, Delaware, beginning at 1:00 p.m. on
Wednesday, February 28, 2007, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.


APPEARANCES:

            JACQUELINE D. BERRY, pro se;

            MARC P. NIEDZIELSKI, Esquire
              Department of Justice
              Carvel State Office Building
              820 North French Street
              Wilmington, Delaware  19801
              on behalf of the Defendant.


                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Berry v. State of Delaware, Division of Child Support

---

**2**

1          JACQUELINE D. BERRY,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5              EXAMINATION
6   BY MR. NIEDZIELSKI:
7      Q.  Ms. Berry, my name is Marc Niedzielski.  Have
8   you ever had your deposition taken before?
9      **A.  For this?**
10     Q.  For anything.
11     **A.  I think.  I think.**
12     Q.  Let me just go over some of the basic rules so
13  you understand.  I will be asking you a series of
14  questions.  It's important that, before you answer the
15  question, you understand the question.  So if, for
16  some reason, I ask you a question you don't understand
17  what I'm asking, you should just let me know and I
18  will rephrase the question.
19          It's also important to understand that the
20  court reporter next to me is reporting
21  stenographically both the questions and the responses
22  to them.  But there has to be a verbal response.  In
23  conversations, frequently we talk to one another and
24  nod our heads and things like that.  That doesn't

---

**3**

1   transcribe.  Okay?  So when I ask you a question, try
2   to give a verbal response to the question.  If you
3   want to take a break at any time, let me know and
4   we'll make arrangements to do that.  Okay?
5      **A.  (Indicating.)**
6      Q.  Ms. Berry, prior to going on the record here, I
7   asked you about -- do you recall receiving two
8   authorizations for release of information from me by
9   letter?
10     **A.  Yes.**
11     Q.  And I asked if you would be willing to sign
12  them?
13     **A.  And I said no.**
14     Q.  That's still the case, is that correct?
15     **A.  Yes.**
16     Q.  All right.
17          What I'd like to do is I'm going to put in
18  front of you a document, and it's going to look
19  familiar because you were the one that produced it.
20  What's different about this document is you see
21  there's numbers in the lower right-hand side?
22     **A.  Mm-hmm.**
23     Q.  Those are called Bates stamp numbers.  We had
24  them put on.  So these documents go from Bates stamp

---

**4**

1   B0001 through B00152, am I correct?
2      **A.  Yes.**
3      Q.  And these just generally are your responses to
4   my interrogatories, correct --
5      **A.  Yes.**
6      Q.  -- that I propounded on you?  All right.
7          Before we get into those, I would like to
8   ask you some other background questions about you
9   actually.  What's your date of birth?
10     **A.  May 31st, 1956.**
11     Q.  And where were you born?
12     **A.  Dover, Delaware.**
13     Q.  Are your parents still living?
14     **A.  My mother is.  My father is deceased.**
15     Q.  Does your mother still live in Dover?
16     **A.  Yes.**
17     Q.  What's her name?
18     **A.  Phyllis Scott.**
19     Q.  And what's her address?
20     **A.  20 Hickory Lane, Dover, Delaware.**
21     Q.  And what's your present address?
22     **A.  20 Hickory Lane, Dover, Delaware.**
23     Q.  Is that your mother's house, or is it your
24  house?

---

**5**

1      **A.  My mother's house.**
2      Q.  Does she own it or is she buying it?
3      **A.  She's buying it.**
4      Q.  As a child were you raised there?
5      **A.  Not as a child.**
6      Q.  Do you remember when your mother acquired that
7   house?
8      **A.  No, I don't.**
9      Q.  How long have you most recently been living at
10  20 Hickory Lane?
11     **A.  Pretty near all my life.**
12     Q.  Well, was there a period of time most recently
13  where you had moved from out of the state or some
14  other address?
15     **A.  Yes.**
16     Q.  Where did you move from?
17     **A.  I went to stay with my son.**
18     Q.  Where is your son?
19     **A.  In North Carolina.**
20     Q.  What's your son's name?
21     **A.  Donnie Berry.**
22     Q.  And he lives in North Carolina?
23     **A.  Mm-hmm.**
24     Q.  What city?  What's the address in North

---

2 (Pages 2 to 5)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

6

1  Carolina?
2  A. 5018 Oak Pasture Lane, Charlotte, North
3  Carolina.
4  Q. What was the reason that you went to live with
5  your son?
6  A. Because I was out on workman's comp. Division
7  of Child Support would not let me return to work and I
8  started seeking employment and was offered a job at
9  North Carolina.
10  Q. And how old is your son?
11  A. 25.
12  Q. And do you remember the first day you moved
13  down there to live with your son?
14  A. To North Carolina?
15  Q. Mm-hmm.
16  A. I left on August 29th of 2005 to drive down.
17  Q. And you remained with your son for how long
18  approximately?
19  A. Well, I mean, I periodically go back and forth
20  to help him manage his properties because he has
21  employment which requires him to be out of state a
22  lot. So currently I help him manage his properties.
23  Q. All right. So you go back there on occasion?
24  A. Basically every weekend I go down there.

7

1      Now, when I went down there before the
2  work, I would come back to Delaware basically every
3  weekend.
4  Q. From August 29, 2005, did you get your job in
5  North Carolina the same day?
6  A. No. I didn't start working until September
7  1st.
8  Q. And who did you go get a job with?
9  A. Division of Child Support in North Carolina.
10  Q. Is that a state office or a county office?
11  A. It was state employment.
12  Q. And did you fill in an application for that
13  job?
14  A. Did I fill an application? Yes, I did.
15  Q. And when did you fill out the application for
16  the job?
17  A. I don't recall the date when I filled out the
18  application for the job. I don't recall the exact
19  date, but I did fill an application.
20  Q. Do you recall if it was sometime prior to
21  August 29th, 2005?
22  A. Yes, it was prior to that because I was offered
23  the job prior to August 29th.
24  Q. Do you recall when you were offered the job?

8

1  A. I don't recall the date. I was offered the
2  job. I think -- I don't know. I don't remember the
3  exact date. It was early August.
4  Q. So does that mean that whenever you did your
5  application was sometime prior to when you were
6  offered the job?
7  A. Yes.
8  Q. Did they ask you for references?
9  A. On my application?
10  Q. Yes.
11  A. Yes, they did.
12  Q. And who did you list as references?
13  A. An ex-supervisor from another agency I used to
14  work with. Telemine Corporation, I know that. As far
15  as the other references on the application, I don't
16  recall. But I know I used that supervisor there
17  because I currently still use her.
18  Q. What was the job that you got in North
19  Carolina?
20  A. Child support agent 2.
21  Q. What were the duties of that job?
22  A. Enforcement of child support orders.
23  Q. Was it similar to the job you had had with the
24  Division of Child Support Enforcement in Delaware?

9

1  A. Not the job that I -- when I resigned from the
2  child support because I was in the customer service
3  unit. When I worked in the Sussex County child
4  support office doing case processing, it was similar
5  to those job duties.
6  Q. So do you recall the date you resigned from
7  the -- let's make this -- we have a lot of child
8  support divisions floating around here. I'm going to
9  ask you the date you resigned from the Division of
10  Child Support Enforcement, State of Delaware.
11  A. I made a call to HR. I think it was like
12  August 15th, on or about August 15th. I spoke with
13  LaTanya Warren and informed her that I was not
14  returning to the Division of Child Support because I
15  had employment that was offered to me out of state.
16  Q. So you left a phone message? Would you speak
17  to the person?
18  A. No. I talked with her. I didn't leave a
19  message. I talked with her.
20  Q. Who is LaTanya?
21  A. She works at HR.
22  Q. Do you know what her job is in HR?
23  A. I think she was an HR specialist. She was our
24  HR representative for child support.

3 (Pages 6 to 9)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

10

1    Q.   What other things did you discuss with --
2    A.   What I discussed with her there was, when I
3    signed up for disability, it's denied. I was told
4    there was overpayment as a result of the disability
5    being denied and discussed the process of paying the
6    money back because I was not returning back to child
7    support here in Delaware.
8    Q.   And what did you tell her you were going to do
9    or not do? Did you tell her you were going to make
10   arrangements to pay it back?
11   A.   Well, what she told me, she had to discuss it
12   with her supervisor to see what the process was with
13   me paying it back because it never had an employee
14   that they state has overpaid as a result of disability
15   being denied that didn't come back to work. Normal
16   procedure, she says, the person returns to work and
17   they, I guess, garnish it from earnings when they
18   return back to work.
19   Q.   In other words, they make an adjustment in
20   their paycheck until it's paid back?
21   A.   Yes.
22       So I spoke to her with regard to not
23   returning and how to pay that money back. She told me
24   she had to follow up with her supervisor. She'd call

11

1    me within 24 hours. So I didn't get a call from her.
2    I called back. I left a voice message 24 hours later.
3    Then I called back 48 hours later, left a voice
4    message. Then the third day, I called because I knew
5    that was I leaving to leave the state of Delaware.
6    And spoke with the Cindi Starr who's another
7    representative in HR. When I was informed by her that
8    LaTanya Warren was no longer employed.
9    Q.   So did you repeat everything you told LaTanya
10   to Cindi about not coming back?
11   A.   Pardon me?
12   Q.   Did you tell Cindi Starr everything you told
13   LaTanya?
14   A.   Yes. And also, I had attorney representation
15   for workman's comp because I was on workman's comp.
16   My attorney was informed -- who informed their legal
17   rep for the workman's comp case that I was not
18   returning back to child support.
19   Q.   All right. So your lawyer that was
20   representing your workman's compensation case notified
21   somebody that you were not returning?
22   A.   Notified the state's legal representation for
23   the workman's comp that I wasn't coming back.
24   Q.   All right. Have you resigned before from a

12

1    job?
2    A.   Yes.
3    Q.   How did you do it?
4    A.   I've done it verbally, and I've done it
5    written. When I resigned, because I'm currently not
6    working in North Carolina, I did that verbally.
7    Q.   You just called them, told them you are not
8    coming back; same thing in North Carolina you did when
9    you called Delaware and said, "I'm not coming back to
10   work"?
11   A.   Yes.
12   Q.   Why did you not return to work in North
13   Carolina?
14   A.   Why did I not return? Because of my mother's
15   illness.
16   Q.   How long did you did you work in North Carolina for
17   their Division of Child Support?
18   A.   Two days shy of a year.
19   Q.   So you worked like until the end of August of
20   2006?
21   A.   No. I started September the 1st of 2005, and
22   on or about September 26 was when I informed them
23   verbally that I was not returning.
24   Q.   That was more than a year then?

13

1    A.   Hmm?
2    Q.   I thought you said two days short of a year you
3    worked for North Carolina.
4    A.   Oh. The reason why you're saying it was longer
5    than a year, I had took a three-week leave of absence
6    which set my time back.
7    Q.   Okay. I got you.
8    A.   I was on a three-week leave of absence from
9    work to come to Delaware to -- my mother was in the
10   hospital. So it set my time back --
11   Q.   So you stopped?
12   A.   -- of accruing that year.
13   Q.   So you stopped in September 2006 working in
14   North Carolina.
15   A.   Yes.
16   Q.   Returned to take care of your mother?
17   A.   Yes.
18   Q.   Is your mother doing okay, or does she have
19   problems?
20   A.   She still has medical problems.
21   Q.   Are you presently employed anywhere?
22   A.   No, sir.
23   Q.   Have you been looking for a job?
24   A.   Yes, sir.

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

14

1  Q.  Where have you been looking?
2  A.  I've been looking for employment here in
3  Delaware, in Maryland, in North Carolina.
4  Q.  Well, I thought the reason you returned from
5  North Carolina to Delaware is to take care of your
6  mom?
7  A.  I did.
8  Q.  But you're saying you're still going down there
9  looking for jobs; in other words, you don't have to be
10 with your mom any more?
11  A.  Well, because of circumstances with my family
12 supporting with her being taken care of.  I have a
13 family member that's going to move closer to her.
14 That's going to relieve some of my responsibilities of
15 having to be there to take care of her.
16  Q.  What's your marital status?
17  A.  Divorced.
18  Q.  How many children do you have?
19  A.  Two.
20  Q.  What are their names?
21  A.  Shanice and Donnie.
22  Q.  You said Donnie is like 25, right?
23  A.  Yes.
24  Q.  How old is Shanice?

15

1  A.  14.
2  Q.  Where does she live?
3  A.  Where does Shanice live?  She currently is in
4  North Carolina.
5  Q.  With --
6  A.  With my son.
7  Q.  Now, you indicated you've been trying to get a
8  job.  Can you tell me the actual names of the places
9  you've been trying?  Have you submitted applications
10 or something like that?
11  A.  I've just been going on line doing
12 applications.  I've applied here in Delaware with the
13 State of Delaware.  I've came -- I have had some
14 interviews in the last month here in Delaware.  I've
15 applied for federal jobs.  I've just been applying for
16 jobs.  I don't -- you know, I don't have a designated
17 area I'm targeting on or designated place where I want
18 to be.  I'm just applying for jobs and going to
19 school.
20  Q.  Are you going to school right now?
21  A.  I'm currently not in school.  I just finished a
22 block at Wilmington College in Dover, but I'm
23 currently not enrolled at this time right now.
24  Q.  What's your course of study?

16

1  A.  Behavioral science.
2  Q.  When did you first start working for the State
3  of Delaware?
4  A.  It's back in the eighties.  Back in the
5  eighties.  I don't know the exact year, but back in
6  the eighties because my son was born in '81.  I was
7  working with them prior to him being born.
8  Q.  Did you work for the State of Delaware solidly
9  continuously through that period of time --
10  A.  No.
11  Q.  -- or has it been like you'd work for like ten
12 months and then be off work for a while, then come
13 back?
14  A.  No.  When I first started working with the
15 State of Delaware, I worked as a CNA.  Then, when I
16 chose to want to go to school to be an social worker
17 or a -- behavioral science, then I pursued my jobs
18 toward what I was going to school for.
19  Q.  CNA is a certified nursing assistant?
20  A.  Certified nursing assistant.
21  Q.  Where did you work?
22  A.  At the Delaware Hospital For the Chronically
23 Ill in Smyrna.
24      I said the eighties?  I'm trying -- I

17

1  think it was the seventies because I worked at the
2  Stokely Center in Georgetown.  My son was born in '81.
3  So early eighties, late seventies when I started
4  working for the State.  I don't recall the exact year.
5  Q.  What is your educational background?
6  A.  I am currently a senior in college.  My
7  classification is a first semester senior.
8  Q.  Where did you go?  What high school did you
9  attend?
10  A.  Dover High School.
11  Q.  And do you remember when you graduated from
12 Dover High?
13  A.  1975.
14  Q.  After high school, after Dover High, what
15 college did you attend?
16  A.  Delaware State College, which is now Delaware
17 State University, and Wilmington College.
18  Q.  The most recent job you had with the Division
19 of Child Support, do you know what the official title
20 for the division you worked for is or that you had
21 worked for?
22  A.  The agency in North Carolina?
23  Q.  No.  The one in Delaware.
24  A.  Do I know what?

5 (Pages 14 to 17)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

18

1    Q. The actual name of the division you worked for.
2    A. The Division of Child Support Enforcement.
3    Q. Okay. Yes. Is that the official title,
4  Division of Child Support Enforcement?
5    A. To the best of my knowledge it is.
6    Q. When did you start working for them?
7    A. In 2000. I don't recall. I think it was
8  October 2000.
9    Q. And did you work continuously from 2000 to when
10  you called in and said, you weren't coming back to
11  work in 2005?
12    A. No, because I was out because of — are you
13  asking was there a break that I left them?
14    Q. Yes. Was there a break?
15    A. No. The only break was when I went out on
16  workman's comp, but that —
17    Q. And that was when?
18    A. June of 2004.
19    Q. And what was that from? Why did you go out on
20  workman's comp in June 2004?
21    A. I was diagnosed with bilateral carpal tunnel.
22    Q. What doctor diagnosed you with that?
23    A. Dr. Evan Crain.
24    Q. What was Dr. Crain's recommendation to you

19

1  regarding work?
2    A. He agreed for me to work but with limitations,
3  no repetitive use of my hands. Because I was in a
4  customer service unit, it consisted of keying. So he
5  put limitations on how many hours a day I could key.
6    Q. Were you able to work with those modifications?
7    A. I could have, but the Division of Child
8  Support — I was out of work. I had surgery on both
9  hands. I had to have surgery on both hands. But
10  prior to that, I was out of work because, I guess,
11  they couldn't accommodate to put me somewhere else in
12  the agency to adhere to the doctor's recommendations.
13    Q. Now, you indicated the unit you were in was
14  called customer service, is that right?
15    A. Customer service unit.
16    Q. Are there a number of customer service units
17    A. Are there a number?
18    Q. Yes?
19    A. There's one customer service unit in New
20  Castle.
21    Q. Are there any in Kent and Sussex?
22    A. No, but when you're hired at Child Support,
23  you're hired as a child support specialist, which at
24  time of hire, I was placed in the customer service

20

1  unit because that's the need where they needed help.
2  But as a specialist, you're qualified to work in
3  actually any unit within the agency itself.
4    Q. They hired you in the customer service unit.
5  Tell us what the job duties of that function are.
6    A. Customer service unit, you're taking incoming
7  calls from clientele that the agency serves. You're
8  addressing their concerns, following up if need be
9  with the appropriate worker, that is, the case worker
10  on the case. You're processing documents and mailing
11  them out. You're updating information in the system
12  in regards to the information that you obtain from the
13  call that's coming in.
14    Q. Does it require lot of computer, finger use?
15    A. Yes. Because, from the moment — you get like
16  a minute in between each call that you take. From the
17  moment that you answer the call, you start basically
18  keying in the conversation.
19    Q. Is that everybody that works in the customer
20  service unit?
21    A. Is that what everyone does in the customer
22  service unit?
23    Q. Yes.
24    A. That's what everyone does, but there are some

21

1  other individuals that have other duties where they
2  are not on the phone as much as other individuals.
3    Q. Okay. Well, within the customer service unit,
4  is there a break down into subunits or something like
5  that?
6    A. There — what do you mean break down?
7    Q. Where you worked, how many people were in the
8  same group as you, had the same supervisor?
9    A. Well, the overall unit itself is supervised by
10  the same supervisor.
11    Q. Who's the supervisor?
12    A. Brenda Annand.
13    Q. How many people report to Brenda Annand?
14    A. I think there was probably like 20 some people
15  in the unit. I don't know any exact amount of
16  employees in the instant.
17    Q. Now, the customer service unit you indicated,
18  are there different jobs within the customer service
19  unit or different functions within the customer
20  service unit?
21    A. Yes, there are some individuals in the customer
22  service unit that handle the constituent complaints
23  from the governor, which those are, I guess, viewing
24  the complaints that people write in to the governor

6 (Pages 18 to 21)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

22

1   and, I guess, researching the case and getting back
2   with that individual whether it be verbally or written
3   in regards to the complaint. I know there's an
4   individual in the unit that does that. There are
5   assigned team leaders, I guess, you know, in the unit,
6   which they kind of like oversee maybe — in each
7   assigned team leader oversees like maybe four or five
8   people on their team.
9   Q.  So Brenda Annand is the supervisor of this
10  group of approximately?
11  A.  She — Brenda has been the supervisor. I
12  forgot when she came on board as a supervisor, but
13  prior to her was Joyce Updike and Dianne Walters.
14  Brenda has been the supervisor in customer service
15  unit -- I don't recall when she came in the unit, but
16  she was not always my supervisor. In the end she was.
17  Q.  When you started with them in 2000, was she
18  your supervisor?
19  A.  No, sir.
20  Q.  And you indicated that, in addition to this
21  group of 20 people that report to Brenda, there are
22  things called team leaders?
23  A.  Yes.
24  Q.  And how many team leaders were there?

23

1   A.  I think there was, like in the unit itself
2   there's like four or five team leaders.
3   Q.  Who was your team leader?
4   A.  I had a team leader. His name was Calvin
5   Parsons. Then I had a team leader. Her name was
6   Darlene Jackson.
7   Q.  Who was your last team leader?
8   A.  Darlene Jackson.
9   Q.  Is she still there?
10  A.  No. She my understanding, she transferred
11  to — well, she transferred back to Georgetown and
12  I — I don't know where she is now, but I know she
13  went back to Georgetown. When I returned to work from
14  workman's comp, she wasn't there.
15  Q.  Well, after your workman's comp, you had
16  surgery you indicated, right? I'm just trying to make
17  sure I get this straight. In June 2004 is when you
18  stopped working because of your bilateral carpal
19  tunnel, correct?
20  A.  Yes.
21  Q.  Then shortly thereafter did you have surgery?
22  A.  Yes.
23  Q.  Do you remember when your surgery was?
24  A.  I had a surgery July 17th. One surgery was in

24

1   July. One was in August. I think it was July 17 and
2   August 9th.
3   Q.  All right.
4   A.  I don't remember the exact date, but one was in
5   July and one was in August.
6   Q.  And what was your course of treatment after you
7   had the surgery?
8   A.  Physical therapy.
9   Q.  And how long did that last?
10  A.  I guess four to six months.
11  Q.  Now, were you able to return to work after your
12  surgery?
13  A.  I was with restriction, but Child Support would
14  not let me return to work.
15  Q.  Did they indicate they had no available jobs
16  with those restrictions?
17  A.  Yes, because I was told, because I was in the
18  customer service unit, which I guess, not wanting to
19  accommodate me, to put me somewhere else in the
20  agency, I was basically told, because I was in the
21  customer service unit, that most of my job functions
22  require a lot of keying.
23  Q.  Now, what I'm going to ask you now is, one of
24  your allegations is based on race, correct?

25

1   A.  Yes, sir.
2   Q.  Why don't you tell us, explain to us what that
3   allegation is, what are you alleging happened because
4   of your race?
5   A.  When I see preferential treatment, whether it's
6   based off your gender, your race, your age, my
7   allegation to race was because Ms. Annand showed
8   preferential treatment towards the white employees
9   versus the black employees, people of minorities.
10  Q.  When was that she did that?
11  A.  She's basically done that from day 1 since I
12  came into the customer service unit.
13  Q.  But now, why don't you explain to us, what was
14  it that you wanted that you indicated you did not get
15  because of your race?
16  A.  Just like the career ladder -- Child Support
17  has a career ladder. It would be that the white
18  employees were always given preferential treatment as
19  far as getting the necessary training for the career
20  ladder versus people of color were not signed off by
21  the supervisor to take those trainings. To actually
22  make a statement and say to a white employee, well,
23  the next test I'll make sure that you set in on the
24  next test, and make sure they get the necessary

7 (Pages 22 to 25)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

26

1  training or whatever so they can set in on the next
2  test. Ms. Annand would show preference with her voice
3  tone and her actions when she would address concerns
4  to white employees versus black employees. With black
5  employees it was the loud harsh tone with the finger
6  pointing in your face. With white employees it was
7  honey or sweetie or something like that in a soft
8  spoken tone.
9      Q. As to you, what job opportunity, promotion, or
10 whatever did you request that you did not get you
11 think based on race?
12     A. I have a daughter that has an illness.
13     Q. What's that illness?
14     A. She has asthma, chronic asthma, diabetes.
15     Q. Type 2?
16     A. I don't know what. Doctor just said diabetes
17 to me.
18     Q. Is she insulin dependent?
19     A. No. I'm a diabetic. I'm not insulin dependent
20 either.
21     Q. Okay. And what was it you requested?
22     A. My daughter's doctor had wrote a letter for me
23 to be moved down close to Dover because I lived in
24 Dover but worked in New Castle. And it had been

27

1  discussed with Ms. Annand on repeated occasions, which
2  each and every time it was discussed with her, I was
3  told that was not going to happen. I was hired in the
4  customer service unit, which I explained to her, I was
5  hired as child support specialist, not just to be in
6  the customer service unit. I know customer service
7  unit is not housed in Kent County. Fully
8  knowledgeable and aware of that. Was not asking for
9  any preferential treatment. Just asking, if there was
10 an opportunity that an opening would have came in Kent
11 County, I would -- wanted to have been considered for.
12     Q. So what you were asking for, as I understand
13 it, you were asking, if a customer service position
14 opened in Dover, you'd like to be placed in that so
15 you could be closer to your daughter?
16     A. Not customer service because customer service
17 is not in Dover.
18     Q. I'm sorry.
19     A. Specialist. If a specialist position became
20 available, I just wanted to be considered for it so I
21 could be in Dover and support the treatment plan that
22 the doctor had for my daughter, knowing that my
23 daughter's condition was worsening because I worked in
24 New Castle and was not available to take her to the

28

1  necessary appointments that the doctor wanted her to
2  go to.
3      Q. Had that changed since when you first got the
4  job with customer service in the Division of Child
5  Support Enforcement in 2000 and had your daughter's
6  situation changed or always been that situation?
7      A. No. It had changed.
8      Q. How had it changed?
9      A. How did it change?
10     Q. Mm-hmm.
11     A. Her medical condition was worsening instead of
12 getting better.
13     Q. Do you recall when it started worsening?
14     A. There was a letter that my daughter's doctor
15 faxed into the job. I don't recall the exact date. I
16 think it was in -- I don't recall the exact date the
17 doctor -- maybe it's in here because I sent it to you.
18 I don't recall the exact date. But my daughter's
19 doctor had called to the job one day stating that she
20 needed to see me because of some results that came
21 back from testing. She faxed a letter in, which the
22 letter stated that she wanted me to be moved closer to
23 Kent County. I don't remember the exact state on the
24 letter.

29

1      Q. Just so I understand what you told us, you told
2  us that the customer service unit you know does not
3  have a location in Dover, is that correct?
4      A. Yes, sir.
5      Q. But your position was you wanted any position
6  that opened that you could be placed into, even though
7  it wasn't in that unit, you'd like to get that --
8  you'd like to be placed in it, correct?
9      A. Just so I could have been closer to home. I
10 wouldn't have cared if it was clerical. I didn't care
11 what it was.
12     Q. Did you on your own apply for positions?
13     A. There were positions, sir, that became
14 available but they were never posted to give me an
15 opportunity or anyone else an opportunity to apply.
16     Q. Now, what division and department were they
17 with, these positions that opened?
18     A. There were two child support specialists that
19 opened in Kent County.
20     Q. What unit were they with?
21     A. Operations, which is case processing, which I
22 had experience doing it. I did that eight months in
23 Georgetown.
24     Q. And you're saying those positions were not

8 (Pages 26 to 29)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

30

1  advertised?
2  A. They were not advertised.
3  Q. Does Brenda Annand, does she have control over
4  those jobs?
5  A. Does she have control over — I don't think
6  that she has control over the jobs, no, sir.
7  Q. So she couldn't give you that job anyway, could
8  she? If one opened, could Brenda give you a job that
9  opened in operations?
10  A. No. And I wasn't asking Brenda to give me any
11  job. I was asking overall the agency itself.
12  Documentation from my daughter's doctor that came
13  in — it was not directly to Brenda Annand. It was
14  directed to the Division of Child Support Enforcement.
15  Q. Can you tell me of an instance where Brenda
16  Annand gave somebody in her unit, customer service,
17  move or whatever they wanted because of their race?
18  A. Yes, sir.
19  Q. Okay. Who would that be?
20  A. Sandy Rossi.
21  Q. And?
22  A. Beth Orendorf. I don't know if these folks are
23  married or what — and Elizabeth Price.
24  Q. And what was it that she did for them?

31

1  A. Those were individuals that came into the
2  division which were hired at child support after my
3  date of hire, which, for some mysterious reason, met
4  the qualifications for the career ladder.
5  Q. So tell me what the career ladder is. I mean,
6  when you were there, right before you resigned, what
7  was your position or your rate or whatever? What was
8  your pay rate?
9  A. I had pay grade ten.
10  Q. And this career ladder, explain that to me.
11  A. Career ladder, it is a packet that the division
12  of child support, I guess, with the assistance of HR,
13  put together that stipulates necessary training and
14  requirements that you have to meet to test to go to
15  the next step, which would resolve — in the next step
16  of pay, and the next step in your job title.
17  Q. Okay. So when you say next step, would that be
18  like an increase in pay grade?
19  A. Yes, sir.
20  Q. Or would it be an increase in the steps within
21  a pay grade?
22  A. It's a change of your position title, and it's
23  an increase in pay.
24  Q. So now you say these people were hired after

32

1  you?
2  A. Yes, sir.
3  Q. And they've advanced up the career ladder,
4  correct?
5  A. Yes, sir.
6  Q. And what is Sandy Rossi's race?
7  A. White.
8  Q. And what is Beth --
9  A. White.
10  Q. And Elizabeth Price?
11  A. White.
12  Q. Now, other than these three, were any other
13  people advanced up the career ladder?
14  A. The only other person I know that advanced up
15  the career ladder is Carolyn Evans. She's black.
16  Q. So Carolyn Evans was advanced up the career
17  ladder and she is African-American?
18  A. Yes.
19  Q. Anybody else that advanced up the career ladder
20  that you can recall?
21  A. That I can't recall.
22  Q. Now, did you request to advance up the career
23  ladder?
24  A. I submitted my — it's called the package you

33

1  have to submit. And I've submitted it three times
2  since I've been with child support and denied three
3  times.
4  Q. Who makes the decision about the career ladder
5  move?
6  A. My understanding is the decision is based —
7  you have to be referred by your supervisor. When I
8  was hired with child support in 2000, the career
9  ladder had just came into operation. Everyone was
10  given an opportunity, to my understanding, to complete
11  their applications. They were given necessary time at
12  work to complete their applications. Then it goes to
13  your supervisor or your supervisor, I guess, agrees
14  and signs off, if you meet the qualifications or the
15  requirements. And then like I guess it's submitted to
16  their panel that they have to review these
17  applications, along with your supervisor, making, you
18  know, the final say to say whether you meet the
19  requirements or have completed the necessary training
20  to go to the next step to take the test. There is a
21  test that they take.
22  Q. Did you ever take the test?
23  A. I was never given an opportunity.
24  Q. So as I understand it, you get a recommendation

9  (Pages 30 to 33)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

34

1    from your supervisor. Then I guess you would get an
2    application form you fill in or something like that?
3        A.  Yes. There's necessary documents that you have
4    to submit of questions that you have to answer.
5        Q.  Did you do that?
6        A.  Yes, sir.
7        Q.  And then you gave them to your supervisor.
8    What did she do with them?
9        A.  What did she do with them? I guess they go
10   before the panel that they have to review these
11   applications.
12       Q.  Did they go before the panel?
13       A.  Yes. They were denied.
14       Q.  The panel denied them?
15       A.  The panel which is the -- the panel -- I don't
16   know who's on the panel, but I know the supervisor has
17   a lot of input as far as the applications and all and
18   then the information that's on your application and
19   then I guess, if all that is accepted, then you take a
20   test.
21       Q.  So the decision is made by a panel as you
22   understand it, and your supervisor has some input in
23   that, correct?
24       A.  Yes.

35

1        Q.  Do you know what your supervisor told the panel
2    about you on those various occasions?
3        A.  No. No.
4        Q.  So one of your claims of discrimination is not
5    being advanced on the career ladder, correct?
6        A.  Yes, sir.
7        Q.  What are your other claims of discrimination?
8        A.  My other claims of discrimination?
9        Q.  Mm-hmm.
10       A.  Because, as I told you, Ms. Annand always
11   showed preferential treatment toward her white
12   employees versus her black employees.
13       Q.  Well, how many black employees reported to
14   Mrs. Annand?
15       A.  How many black employees report to Mrs. Annand?
16       Q.  Mm-hmm.
17       A.  I don't recall how many employees are in her
18   unit now. When I was -- let's see. When I was in her
19   unit -- when I was in her unit, it was probably about
20   13 blacks in the unit versus the -- there were a
21   couple of Hispanics and the rest white.
22       Q.  You're saying she treated all 13 of those
23   African-Americans differently than she treated the
24   whites?

36

1        A.  She showed preferential difference with black
2    and white employees, yes, she did.
3        Q.  Now, when you saw preferential treatment, could
4    you be more specific? And I'm going to ask you first
5    about you. In other words, where was a case where she
6    treated you differently because of your race as
7    opposed to she treated a white person better because
8    of their race. Like, for instance, was there an
9    incident where you requested time off and you didn't
10   get time off but a white employee did get time off or
11   something like that?
12       A.  I would interview a lot, and I always kept
13   myself abreast and always wanting to go to necessary
14   trainings to enhance my abilities. I would be denied
15   trainings that I wanted to go to versus the white
16   employee would be accepted to go to the training. A
17   lot of times she deny me from going to training
18   because I would miss a lot of time from work because
19   of my daughter's medical condition as well as myself.
20   I had a medical condition myself. But I since then
21   have had surgery to take care of my medical condition
22   that I had family medical leave -- I had family
23   medical leave for myself as well as my daughter. And
24   I was always told, you know, that I couldn't take the

37

1    necessary trainings or something because of me being
2    out for the family medical leave.
3            Several interviews that I would go on, I
4    always had to bring her back documentation of where I
5    went for the interview, what time the interview
6    started, when the interview ended. That would never
7    happen with the white staff person.
8        Q.  How is it you know that that would never happen
9    with the white staff person?
10       A.  Because I know when they went to interviews
11   that they didn't have -- they did not bring her back
12   documentation.
13       Q.  How do you know that?
14       A.  Pardon me.
15       Q.  How do you know that?
16       A.  Because I asked.
17       Q.  You asked the person that came back?
18       A.  I asked the person.
19       Q.  Did you miss a lot of time from work?
20       A.  I did.
21       Q.  Were you late coming to work?
22       A.  No. I was not late coming to work with -- you
23   know, would come to work when I was scheduled to be to
24   work with the exception of my daughter's illness and

10 (Pages 34 to 37)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

38

1  my illness.
2      Q.  How much time did you lose from work because of
3  your illnesses?
4      A.  My illnesses?  Every month.  Every month I knew
5  that my problem I had -- I knew that every month I was
6  going to be out of work at least two, sometimes three
7  days.
8      Q.  Would you use sick leave?
9      A.  I use family medical, family medical leave.
10     Q.  Well, do you have any sick leave accrued that
11  you could use it?
12     A.  When my sick leave was exhausted as well as my
13  vacation, it was leave without pay.  It was family
14  medical leave without pay.
15     Q.  Well, did you put in for that family medical
16  leave?  Would you put in for it?  Would you apply for
17  it?
18     A.  Yes.  I had to apply for it.
19     Q.  Was that given to you?
20     A.  The family medical leave?
21     Q.  Mm-hmm.
22     A.  Yes.
23     Q.  For your own personal problems you said you'd
24  lose about three days a month, correct?

39

1      A.  Yes, sir.
2      Q.  How many times would you lose a month for your
3  daughter's medical problems?
4      A.  My daughter's time was pretty consistent.
5  Probably two to three days per month for her.
6      Q.  So a total of up to six days per month were
7  lost because of -- work days were lost because of
8  either your medical problems or your daughter's
9  medical problem?
10     A.  Yes.
11     Q.  So that was six days a month on average that
12  you were not available for work in the customer
13  service unit?
14     A.  Yes.
15     Q.  Did you have the same situation when you worked
16  for North Carolina Division of Child Support?
17     A.  Not with me.  The same situation with my
18  daughter.  And then the family medical -- for my mom.
19     Q.  You indicated there was period of time in North
20  Carolina you missed a three-week period?
21     A.  Yes.
22     Q.  Who was that for?
23     A.  My mother.
24     Q.  In front of you are the documents that we

40

1  discussed very briefly initially that have been Bates
2  stamped.  And on page Bates stamped B0002 is your
3  answer of the people that are witnesses that can
4  attest to the alleged allegation against plaintiff in
5  regards to claims of race discrimination or
6  retaliation, failure to promote plaintiff.  And you
7  indicated a number of people, correct?
8      A.  Yes, sir.
9      Q.  What is Nicole Waters -- when did you work with
10  her?
11     A.  When did I work with her.
12     Q.  Mm-hmm.
13     A.  I don't recall the exact date when Nicole came
14  to Child Support because she was hired after myself
15  and I only know the exact date when she left Child
16  Support, but she left.  I don't know the exact dates.
17  I worked with Nicole at least two years, I would say.
18     Q.  Now, what information does she have regarding
19  your claim of race discrimination.
20     A.  What information does she have?
21     Q.  Mm-hmm?
22     A.  She can attest to Ms. Annand showing
23  preferential treatment with her white employees versus
24  the black employees.  She can attest to Ms. Annand

41

1  yelling, pointing her finger, making the negative
2  remarks to me, more or less to -- you know,
3  intimidating you in front of your other co-workers and
4  stuff.
5      Q.  Okay.  And what about retaliation, what
6  evidence can she give about retaliation?
7      A.  Well, she has seen Ms. Annand, you know, where
8  she has, you know, yelled at me and pointing her
9  finger and stuff.
10     Q.  No.  But now I'm asking you about the
11  retaliation.  You indicate you have a claim for
12  retaliation.  In other words, you're claiming somebody
13  did something to you because of something else you
14  did.
15     A.  Oh.  You want to know what Ms. Waters can say
16  in regards to retaliation?
17     Q.  Yes.
18     A.  I don't know if she can elaborate on
19  retaliation.
20     Q.  How about, could she give us any information on
21  failure to promote plaintiff?
22     A.  Yes, she can.
23     Q.  And what would she say?
24     A.  That there is preferential treatment shown

11 (Pages 38 to 41)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

42

1    toward the white employees as far as meeting — you
2    know, being provided with the necessary trainings that
3    you have to meet in order to be considered for the
4    career ladder.
5    Q. Okay.
6    A. There was preferential treatment showed with
7    the white employees versus the black employees,
8    employees of minority. She can attest to that.
9    Q. What is Ms. Waters's race?
10   A. Black.
11   Q. And did she put in for career ladder
12   advancement and was denied?
13   A. I don't know.
14   Q. What about Nancy Santana?
15   A. She's Hispanic.
16   Q. And what information does she have about race
17   discrimination, your claim of race discrimination?
18   A. She can attest that Ms. Annand showed
19   preferential treatment towards her white employees
20   versus her black employees. She can attest that, with
21   the career ladder, that there is preferential
22   treatment showed with the white employees versus the
23   black employees.
24         As far as retaliation, Ms. Santana is

43

1    aware and knows that I do have a discrimination
2    claim -- complaint against Child Support, and she can
3    attest to Ms. Annand's actions of getting in my face,
4    yelling, pointing her finger.
5    Q. Okay. When Ms. Annand would get in your face
6    and point her finger at you, would she use racial
7    epithets to describe you?
8    A. Say that again, please.
9    Q. You've indicated a number of times that
10   Ms. Annand would get in your face and point her finger
11   at you and yell. When she was doing that, was she she
12   using racial slurs against you?
13   A. She said, "You people."
14   Q. In what context did she say, "You people"?
15   A. In what context would she say, "You people"?
16   Q. Yes, ma'am?
17   A. Explain to me that you mean.
18   Q. Well, you took that as being a pejorative term,
19   "you people."
20   A. Mm-hmm.
21   Q. I'm asking you to explain why that is. Put it
22   in the context. You said she got in your face and
23   she yell at you. How many times has that happened?
24   A. Several.

44

1    Q. How many times?
2    A. If you went over all with me working at Child
3    Support, sir, when I say several, I can say
4    Ms. Annand's yelled at me over 50 some times.
5    Q. Now, she's yelled at you over 50 times. What
6    has she yelled at you about?
7    A. Unnecessary things. It may be from me being
8    away from my desk or many times, when I came back in
9    for being out for my daughter's illness or my illness,
10   she would yell at me telling me that I need to be at
11   work. The other people in the unit have to hold up
12   the fort because you're not here and...
13   Q. So when she yelled at you this 50 times from
14   the time you worked at Child Support, was it always
15   about the job?
16   A. Was it always about the job? Most of the time,
17   it would be because of me being out because of my
18   daughter's sickness and my illness.
19   Q. Is it true that Ms. Annand would tell you that,
20   if you are not at your job, other people have do your
21   work for you?
22   A. Yes, sir.
23   Q. Would other employees sometimes be angry about
24   the fact that you were not there or you were missing

45

1    time?
2    A. If they were, I don't recall. In the customer
3    service there was really not work that I'm leaving
4    behind for someone else to do. It just makes someone
5    get more calls and than if I was there that day. It's
6    not like there was paperwork. Somebody has to do it
7    or something.
8    Q. But you will agree with me that -- how many
9    people in the customer service unit when you were
10   there answered the phones, took calls about child
11   support? How many people doing just what you were
12   doing?
13   A. The people in the unit, 15, 20 some people in
14   the unit.
15   Q. And if you're not there, then somebody else has
16   to take the calls that you would have been able to
17   take had you been there, correct
18   A. That's true.
19   Q. So somebody else, co-employees are getting more
20   work to do because you're not there.
21   A. That's true.
22   Q. Is that understandable that someone would be
23   angry about that?
24   A. It may be understandable that someone would be

12 (Pages 42 to 45)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

46

1    angry, but when I had family medical leave, that is a
2    federal benefit. I have no control over my illnesses
3    or my daughter's illness. And each and every time I
4    missed work, the appropriate documentation was
5    provided. I could see if I was abusing time or
6    something like that, not actually being sick and not
7    coming, but I had documentation for the medical
8    reasons.
9      Q. Now, tell me about what your claim of
10   retaliation is.
11     A. Well, Ms. Annand has repeatedly said to me that
12   my attendance was going to affect my performance
13   reviews because of me having to be out of work because
14   of my daughter's illness and my illness. I was
15   basically told that up front.
16     Q. Did Ms. Annand or anyone take action against
17   you because you filed an EEOC complaint?
18     A. I was treated different. A whole -- I was
19   treated in a different way after I did that versus the
20   negative way I was being treated before that; it got
21   worse after that.
22     Q. Now, when you say it got worse, how did it get
23   worse?
24     A. Everything that I did it seemed like it was

47

1    just never right in her vision. Anything to take a
2    pen and piece of paper to just write anything up on
3    me. I started applying more for jobs, trying to
4    interview out of the agency itself. I was not given
5    the merit benefit of the time to attend the interview.
6    I was told that if I go to a job interview from
7    home -- I live in Dover, work in New Castle. If I had
8    an interview at 8:30 in the morning, I was told by
9    Ms. Annand that I had to come up to New Castle and
10   sign in and then drive back down to Dover to the
11   interview. I was not given the time to go, you know,
12   to any state interviews or anything, and when I did go
13   to interviews, I had to bring being documentation back
14   of where I went and what time it began, what time it
15   ended.
16       I noticed after I did file the complaint,
17   the negative statements and the negative treatment
18   from Ms. Annand became a bit more intense, you know,
19   than what I tolerated prior to filing the
20   complaint.
21     Q. Do you recall when you filed the complaint?
22     A. Do I recall?
23     Q. Yeah. When you filed the EEOC charge of
24   discrimination?

48

1      A. In Philadelphia I think it was in October of
2    2004. I don't remember the exact date.
3      Q. Let me show you a document and ask you if this
4    refreshes your memory.
5      A. Yes.
6      Q. What's the date on that?
7      A. January 2005.
8      Q. That's the date you filed your charge of
9    discrimination?
10     A. Yes. With the Philadelphia...
11     Q. All right. Now, did you work between January
12   12, 2005?
13     A. Did I work?
14     Q. At the Division of Child Support?
15     A. I worked at the Division of Child Support until
16   August of 2005.
17     Q. So you say the things -- I'm going to ask you
18   to be as specific as possible. After you filed that
19   complaint January 12, 2005, what actions were taken
20   against you you believe because you filed that EEOC
21   action?
22     A. What actions were taken against me?
23     Q. Mm-hmm.
24     A. With Ms. Annand or Child Support?

49

1      Q. Anyone. If you claim somebody is retaliating
2    against you for filing the EEOC action, what was it?
3      A. Well, as I explained to you, Ms. Annand became
4    very rude toward me. Her total reaction just changed
5    toward me in the unit itself. There was really
6    nothing nice that she could say to me. When she did
7    voice or address something to me, it was in a
8    negative, rude, you know, tone with the finger
9    pointing, you know, in your face thing, snatching
10   papers from me. Stuff like that started to occur.
11     Q. Now, during that period of time, from January
12   2005 until you resigned in August, was there anything
13   you requested or wanted from your employer that you
14   didn't get because you filed an EEOC action?
15     A. I'm not saying there was something that I
16   didn't get because I filed the EEOC action. Just like
17   I made the request, you know, to go to Kent County,
18   I'm not saying that I didn't get it because I filed
19   the EEOC action. But as far as why I wasn't given an
20   opportunity to go to Kent County, knowing that I
21   wasn't asking for any preferential treatment, is
22   because of my daughter's medical condition and then to
23   know that positions became available and I wasn't
24   considered for them.

13 (Pages 46 to 49)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

50

1    Q.  Well, we went over that before, remember?  And
2    I think you told me that Ms. Annand really has no
3    control over that; she can't give you a job outside of
4    her own unit, right?
5        A.  She has no control over that, but when my
6    daughter's doctor first sent in the letter and I
7    discussed it with Ms. Annand, she just based that
8    decision off herself to tell me, no, you're not going
9    anywhere, you're just going to stay here in the
10   customer service unit, instead of actually following
11   up the protocol and the chain of command that this
12   request has been made by this employee's child's
13   physician and, you know, maybe it could have been
14   considered.  She didn't do that.  She didn't do
15   anything with it.  She just made her own decision and
16   told me I wasn't going anywhere.
17       Q.  Could you have gone over her head and made the
18   request above her head?
19       A.  I probably could have, but I followed chain of
20   command which was to go and discussion it with my
21   supervisor.
22       Q.  After you did that, did you say, "Well, I'd
23   like you to pass this on"?
24       A.  Did I say that to Ms. Annand?

51

1    Q.  Right.
2        A.  No, because, to me, as her supervisor, it
3    should have been her responsibility to have the
4    knowledge and know to do that herself without me
5    having to ask her to do that.
6        Q.  What information regarding race discrimination,
7    retaliation, or failure to promote can we get from
8    Tomika Lester?
9        A.  Tomika Lester can basically elaborate that
10   Ms. Annand shows preferential treatment toward the
11   white employees versus the employees that are black or
12   minorities, attest that, with the career ladder
13   promotions, that blacks are denied opportunity to
14   obtain the necessary training or whatever versus the
15   whites always would meet that.
16       Q.  And how about retaliation?
17       A.  She can attest that Ms. Annand has told me,
18   because of my absences, because of my illness and my
19   daughter's illness, that she said it was going to
20   affect my performance review.
21       Q.  Okay.  What about Calvin Parson, what
22   information does he have about discrimination,
23   retaliation, failure to promote?
24       A.  He can attest that Ms. Annand showed

52

1    preferential treatment toward the white employees
2    versus the black.  He can attest that, with the career
3    ladder, that the blacks were denied the career ladder
4    in the unit versus the whites were always accommodated
5    with the necessary training or whatever they needed to
6    adhere to the career ladder.
7        Q.  And retaliation, failure to promote, same
8    thing?
9        A.  Yes, sir.
10       Q.  How about Earnie Eggleston.
11       A.  Earnie can attest that she shows preferential
12   treatment with her white employees versus the black.
13   He can attest to the career ladder, that the whites
14   are given preferential in getting the training or
15   whatever to go up to the next step with the career
16   ladder versus the blacks aren't.
17       Q.  Now, are any of these individuals that you
18   listed here still working at Division of Child Support
19   Enforcement?
20       A.  I know Nicole Waters doesn't work there because
21   she left before I left.  To the best of my
22   knowledge — well, Calvin Parson, he doesn't work
23   there because he left before I left.
24       Q.  How about Earnie Eggleston?

53

1        A.  I assuming Earnie is still there.  I'm assuming
2    Tomika is there, and Ms. Santana, I know she is still
3    there to the best of my knowledge.
4        Q.  All right.  Now, did you have performance
5    reviews while you worked at the Division of Child
6    Support Enforcement?
7        A.  Delaware?
8        Q.  Yes.
9        A.  I had two.
10       Q.  And how were those reviews?  I mean how were
11   those evaluations?
12       A.  Those evaluations contained negative comments.
13       Q.  Negative meaning things that are not good about
14   you?
15       A.  Right.
16       Q.  And are you saying they are not true?
17       A.  Yes.
18       Q.  And do you know what some of them are based on,
19   these negative comments are based on?
20       A.  One evaluation — I don't know which one you
21   have in front of you.  The one evaluation she states
22   that she got a complaint from a client, which the
23   complaint stated negative statements that were made by
24   this client.  In the customer service unit your calls

14 (Pages 50 to 53)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

54

1    are monitored and they are recorded. She shared the
2    complaint with me, which I denied the allegations. I
3    would — said that I called somebody's dad a deadbeat
4    dad or something of that nature. I don't talk to
5    individuals like that, sir.
6          And in the complaint the client had
7    recommended for me to be placed out of the customer
8    service unit, performing a job duty, as they said,
9    processing payments or taking a training, maybe anger
10   management or something of that nature, which these
11   are trainings that are in our SPO training manual,
12   exactly stating the trainings as they're titled in the
13   SPO manual.
14         Some of the allegations that were made in
15   the customer's complaint would — someone calling in
16   to the division, sir, they are not going to even have
17   knowledge to even know some of the things that were
18   said in the complaint. Like the lady said she had
19   asked me had a check posted to her account. And the
20   reply, what the client said I said, no. But then the
21   client replied and said, "Well, if Jackie had looked,
22   she would have seen that a payment had posted on this
23   date and was ready to go out." A client is not going
24   to know that, you know, to call into the Division of

55

1    Child Support. Only you sitting there at the terminal
2    and seeing what has posted on the account or whatever,
3    you're going to know that as the employee, but not a
4    client calling into the Division of Child Support is
5    not going to know that.
6     Q.  In any event, at these evaluations, were you
7    given an opportunity to respond if you didn't agree
8    with them?
9     A.  I was given the opportunity to respond, but I
10   was told by Ms. Annand it did not make a difference
11   what my response was going to be because her rating
12   was not going to change.
13    Q.  But did you do whatever your response was? Did
14   you do your comment? You're allowed to put comments
15   in, correct?
16    A.  Pardon me?
17    Q.  You're allowed to put comments if you don't
18   agree with the evaluation, correct?
19    A.  Yes, you are.
20    Q.  Did you put any comments in?
21    A.  No, I didn't.
22    Q.  Now, you in your answers to interrogatories on
23   B00014, you talk about the charge of discrimination
24   filed by Nancy Santana. You see that?

56

1     A.  Yes.
2     Q.  How do they relate to your claims?
3     A.  How — how does Ms. Santana's relate to my
4    claim?
5     Q.  Well, first of all, do you know what
6    Ms. Santana is claiming?
7     A.  No. I know she has a claim in regards to race
8    discrimination because of the preferential treatment
9    that is given to the white employees versus the black
10   employees in the unit and with the career ladder, how
11   the white employees are accommodated and provided the
12   necessary training or whatever for the career ladder
13   where the blacks are denied or not given the
14   opportunity to get that necessary training.
15    Q.  Do you know if the people that are moving up
16   the career ladder, do you have the same educational or
17   background that they do?
18    A.  I have a better educational background,
19   experience background than they do.
20    Q.  What about the complaint filed with the
21   Industrial Accident Board by Calvin Parson?
22    A.  I was subpoenaed to attest to his allegations.
23   I did not get to attend because of the passing of my
24   uncle and his funeral was that day. But to the best

57

1    of my knowledge, I know that his complaint consisted
2    of the racism that was displayed by Ms. Annand. As
3    far as what else was in his complaint, I have no
4    knowledge. I was not there. But I know that
5    Ms. Annand showing preferential treatment with the
6    white employees versus the back employees.
7     Q.  But was that a matter that was before the
8    Industrial Accident Board?
9     A.  Pardon me?
10    Q.  Was that a workman's comp claim Mr. Parson had?
11    A.  I don't know what his claim was based off of.
12    Q.  What was your understanding of why you were
13   subpoenaed to come as a witness there?
14    A.  To — the only thing I could have witnessed
15   would be to attest to the negative treatment toward
16   Mr. Parson as by Ms. Annand and the preferential
17   treatment shown toward the white employees versus the
18   blacks.
19    Q.  What was Mr. Parson claiming his workers'
20   compensation claim was, do you know?
21    A.  I have no knowledge.
22    Q.  Was it bad back, do you know? I mean, was he
23   trying to get out work? I mean, he said he couldn't
24   work any more or something or injured or what?

15 (Pages 54 to 57)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

58

1    A.  I didn't attend.
2    Q.  But you knew Mr. Parson, didn't you?
3    A.  Yes.
4    Q.  Do you know what his problem was before he went
5    to workers' comp?  Did he have a physical problem on
6    the job?
7    A.  I have no knowledge, sir.
8    Q.  You understand that generally at the Industrial
9    Accident Board, not being treated well by your
10    employer is not a basis of a workman's compensation
11    claim?
12    A.  Right.
13    Q.  Usually it's something like you were injured on
14    the job or something like that?
15    A.  Right.
16    Q.  Do you know if that was what Mr. Parson was
17    alleging?
18    A.  I have no knowledge of what he was alleging as
19    far as workman's comp.
20    Q.  Did you file a workman's comp matter?
21    A.  Yes.
22    Q.  When was that?
23    A.  It was done in 2004.
24    Q.  It was about your hands?

59

1    A.  Yes.
2    Q.  Carpal tunnel?
3    A.  Carpal tunnel.
4    Q.  And what eventually happened with that matter?
5    A.  What happened with it?
6    Q.  Mm-hmm.
7    A.  I just recently received a small computation
8    from the carrier.
9    Q.  In other words, that you were granted workman's
10    compensation benefits --
11    A.  Yes.
12    Q.  -- for your repetitive motion injury?
13    A.  Yes.
14    Q.  Now, were there any jobs in the customer
15    service unit in which you were working at when you
16    went off of workers' comp that was available to you
17    with the limitations that your doctor wanted you to
18    work under?
19    A.  Were there any jobs in the customer service
20    unit?
21    Q.  Mm-hmm.
22    A.  Not in the customer service unit, but there
23    were other jobs available within the agency itself in
24    another unit.

60

1    Q.  Now, in addition to that, did you apply for
2    disability pension?
3    A.  June 23rd I went to HR to apply for disability
4    pension.  This is prior to going out on workman's
5    comp.
6    Q.  What year did you apply for your disability
7    pension?
8    A.  Let me make sure we are -- the disability that
9    I applied for or the disability that I was eligible
10    for, the supplemental disability prior to going out on
11    workman's comp.
12    Q.  Did you apply for a state disability pension?
13    A.  I went to -- I went to the HR office to apply
14    on June 23rd for a supplemental disability.  It was
15    explained to me that this disability -- I would
16    continue to get my wages, pending whether the
17    workman's comp carrier was either going to deny or
18    accept my claim.
19    Q.  Okay.
20    A.  I went to the HR rep, Alice Bailey's office.
21    When I got to her office that day, she started to
22    elaborate when I came into her office how can I relate
23    my injuries to the job?  How can you say that you
24    obtained this carpal tunnel here?  Elaborated in

61

1    stating that there was an HR tech that I'm assuming
2    had an injury claimed with carpal tunnel and submitted
3    it and she said the claim was denied.  I responded to
4    her, "I didn't come to your office for this.  And as
5    far as you setting here dictating like you're an
6    attorney or doctor to me to tell me how I have
7    sustained the injury," I said, "Here's my attorney's
8    name," and gave her the attorney's phone number.  I
9    brought a concern to her when I looked at the injury
10    report that day -- it was my -- it was incorrect
11    address on the injury report.  And I informed that
12    that address was incorrect.  She started yelling at
13    me.  She told me that I had to leave her office.  I
14    had drove a state car from the Child Support office
15    over to her office.  She told me I had to take the car
16    back and get off state premises.
17    Q.  Who is this that told you this?
18    A.  Alice Bailey.
19        LaTanya Warren's office, who was down the
20    hall from Ms. Bailey's at that time, heard the
21    commotion down there in her office, and she got up and
22    came down to Ms. Bailey's office I guess to more or
23    less see what was going on because the lady was just
24    sitting there yelling at me.  When I told her I had a

16 (Pages 58 to 61)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

62

1  lawyer, she said she had nothing further to say to me.
2  But my intent was I was sent to go to her office by
3  Ms. Annand to complete the documents for this
4  supplemental disability which is supposed to be
5  granted prior to the workman's comp carrier picking up
6  my claim. And I never received that benefit because
7  she told me to get out of her office and leave state
8  property when I told her I had an attorney because she
9  was setting there like interrogating me, you know,
10 asking me questions, how are you going to say you got
11 in carpal tunnel here? And I said, I told her, "I
12 didn't come to your office for that. I came to fill
13 out the necessary documents." And I just told her,
14 "If you need to know anything about this workman's
15 comp injury, here's my lawyer's name and number, and
16 you can call him." And that's what I gave her.
17     Q.  You did apply for the supplemental short-term
18 disability?
19     A.  Yes. That was in 2005.
20     Q.  Same time you went off on workers' comp, right?
21     A.  I was already out on workman's comp.
22     Q.  All right. In any event, you also applied for
23 disability pension, long-term disability pension?
24     A.  Yes.

63

1     Q.  That was denied by the pension board?
2     A.  Yes.
3     Q.  This is one of the forms you signed in that
4  pension application. Let me just show it to you.
5  It's signed by you. Is that your signature down
6  there.
7     A.  Yeah. Yes.
8     Q.  This is a statement of credible service for
9  you, correct.
10    A.  Yes.
11    Q.  And it shows that you first started working on
12 December 1st, 1977.
13    A.  Mm-hmm.
14    Q.  Do you recall that.
15    A.  When you asked me when I started working for
16 the state, I said the eighties, but then I said the
17 seventies because worked at Stokely in Georgetown.
18    Q.  Does this refresh your memory that it was 1977
19 you started?
20    A.  Yes.
21    Q.  Okay. You see all these, even though you
22 started working in 1977, what was the total amount of
23 credible service you had?
24    A.  With the State?

64

1     Q.  Yeah. 11 years, 1 month, and 15 days, you see
2  right here?
3     A.  Yes.
4     Q.  You see next to it there's a description of
5  periods of time you worked for these different
6  agencies, correct?
7     A.  Mm-hmm.
8     Q.  There's a number of workman's comp with pay,
9  correct?
10    A.  Mm-hmm.
11    Q.  And in other words, you've had one, two, three,
12 four, five, six workman's compensation claims while
13 you worked for the State, correct?
14    A.  I had a workman's comp claim at the Delaware
15 Hospital for Chronically Ill. You're going to see
16 that one, and then you are going to see the workman's
17 comp claim with the Child Support. Those are the only
18 workman's comp claims I've had since working with the
19 State.
20    Q.  Okay. Well, do you recall what the first
21 workman's comp claim was when you were working at
22 DHCI?
23    A.  Yes.
24    Q.  What was that for?

65

1     A.  It was -- I walked into a patient's room. The
2  water pitcher had been knocked over the by patient.
3  And I slipped and fell in the water. I had surgery on
4  my ankle. They had to reconstruct my ankle.
5     Q.  Then you had another workman's comp in '83 at
6  DHCI. Do you recall what that was about?
7     A.  It's all with the ankle. That was the only one
8  I've ever had at DHCI.
9     Q.  You were out three years with the ankle?
10    A.  With DHCI. Those periods in there with the
11 Delaware Hospital For Chronically Ill only related to
12 my ankle.
13    Q.  All right.
14    A.  I had to have repeated surgeries on it.
15    Q.  In '85 you had a workers' comp leave of
16 absence. Do you recall what that was for?
17    A.  Is that a Delaware Hospital for the Chronically
18 Ill?
19    Q.  It could be.
20    A.  Well, the only workman's comp I've ever had was
21 with my ankle and then with the carpal tunnel.
22    Q.  Do you remember then you had another 12
23 months -- okay. Wait a second. DMR, that was
24 Stokely?

17  (Pages 62 to 65)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

66

1   A.  Mm-hmm.
2   Q.  2000?
3   A.  I didn't have a workman's comp there.
4   Q.  Were you on workman's comp in 2004 and 2005?
5   A.  Was I?
6   Q.  Yeah.  Did you have a workman's comp claim in
7   2004 and 2005?
8   A.  With Child Support.
9   Q.  Right.  What was the one in 2004 about?
10  A.  The only workman's comp I've had with Child
11  Support was with the carpal tunnel.  I've never had
12  any workman's comp claim with Child Support.
13  Q.  See, I thought you went off work for workers'
14  comp in 2005, but that's not correct; you went out in
15  2004?
16  A.  2004.
17  Q.  But your surgery wasn't done until 2005?
18  A.  No.  I had both surgeries in 2004.
19  Q.  Do you know who the division director of the
20  Division of Child Support Enforcement is?
21  A.  Chuck Hayward.
22  Q.  What's his race?
23  A.  Black.
24  Q.  When you saw or you indicate you saw these

68

1   Q.  Ms. Annand, you talked to her supervisor
2   Ms. Walters?
3   A.  I talked — I had opportunity to meet with
4   Ms. Walters and address my concerns about Ms. Walters.
5   Q.  What race is Ms. Walters?
6   A.  She's white.
7   Q.  And who does she report to?
8   A.  Ms. Walters's supervisor I'm assuming would be
9   Chuck Hayward.  I don't —
10  Q.  All right.  So you discussed it with her.  What
11  happened after you discussed it with Ms. Walters?
12  A.  Well, when — the day I discussed it with her,
13  she stated that she had, you know, complaints about
14  Ms. Annand with the same thing I was addressing, and
15  she was working on it, going to address it.  But she
16  also ended in closing saying that Ms. Annand yells
17  because she has a hearing impairment.  I says, "Well,
18  if she has a hearing impairment, I don't see her
19  yelling at the white employees like that."  And I
20  said, "Even if she has a hearing impairment, it has
21  nothing to do with this.  Your hearing has nothing to
22  do with pointing your finger up in somebody's face."
23  Q.  Are you saying Ms. Annand has never pointed her
24  finger at a Caucasian employee?

67

1   various preferential treatments, did you complain to
2   anyone?
3   A.  To my — I had called — I spoke with
4   Ms. Loretta Brase in regards to my concerns.  I spoke
5   with a Mr. Craig Chambers, which he explained to me
6   that he was the EEOC for the State and referred me to
7   Ms. Rossi, which he stated that she was the EEOC
8   person for our agency itself, our labor relations.
9   Q.  Mm-hmm.
10  A.  I had spoke with Ms. Annand's supervisor Dianne
11  Walters in regards to — when I talked with her, it
12  was in regards to Ms. Annand yelling and the finger
13  pointing that any face, which I let her know that
14  appears threatening to me and I will not tolerate it.
15  She elaborated and stated that Ms. Annand had a
16  hearing impairment.  I replied and told her that I
17  disagreed with her because, if you have a hearing
18  impairment, which I have a family member that has a
19  hearing impairment, you're not going to show that
20  difference in treatment versus to a black person
21  versus a white.  But if you have a hearing impairment,
22  if you're going to yell, you're going to yell at them
23  whether they are black or white.  But that wasn't the
24  case with Ms. Annand.

69

1   A.  I've never seen her raise her voice or point
2   her finger at a Caucasian employee in that customer
3   service unit.
4   Q.  Is it possible it's happened and you haven't
5   seen it?
6   A.  Pardon me?
7   Q.  It's possible it's happened, you just haven't
8   seen it?
9   A.  It's not going to happen.
10  Q.  Well, my point is, there's a lot of time you
11  missed from work, six days on average a month.  So a
12  lot could have happened on the six days that you are
13  not there, correct?
14  A.  Correct.
15  Q.  I mean, that's a work week, six, days, right
16  every month you're missing a work week?
17  A.  Correct.  But to answer your question, sir,
18  Ms. Annand is not going to yell at a white employee or
19  get up in their face and point their finger.
20  Q.  All right.  Does the Division of Child Support
21  Enforcement have a policy regarding race relations and
22  equal opportunity and equal treatment of people?
23  A.  Mm-hmm.
24  Q.  And you're familiar with that?

18  (Pages 66 to 69)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

70

1   A.  Somewhat.
2   Q.  All right.  And have you received training as
3   to, if you have a complaint, where to make the
4   complaint?
5   A.  Where to make the complaint?
6   Q.  Mm-hmm.
7   A.  Yes.
8   Q.  And when was it you did that, you made those
9   complaints?
10  A.  I went and I met with — as I told you, I spoke
11  with Loretta Brase, which my contact to her has been
12  denied.  I spoke with her in regards to the complaints
13  of negative —
14  Q.  Do you recall when?
15  A.  When I spoke with Ms. Brase?  It was — I was
16  out on workman's comp when I spoke with her.  July, I
17  could say, July of '04 when I spoke with her.
18      And I also then with LaTanya Warren and
19  Alice Bailey.  I don't remember the exact date when I
20  met with them.  I have it in my documents.  It's in
21  regards to the harsh treatment about — from
22  Ms. Annand as well as the request for me to be
23  transferred to Kent County.
24  Q.  Who is Bailey?

71

1   A.  Alice Bailey is HR tech or rep that works on
2   the Herman Holloway campus.
3   Q.  What's her race?
4   A.  White.
5   Q.  And LaTanya, who is the other person?
6   A.  Warren.  She's black.
7   Q.  Where does she work?
8   A.  She worked on the Herman Holloway campus.
9   Q.  And what did they say they were going to do for
10  you?
11  A.  They said that they were going to discuss —
12  well, Ms. Warren said she was going to discuss it with
13  her supervisor.
14  Q.  Did she discuss it with her supervisor?
15  A.  I don't know if she did or didn't.
16  Q.  Right.  Now, in 2004, were you working anywhere
17  other than for the State?
18  A.  In 2004?
19  Q.  Mm-hmm.
20  A.  I worked a part-time job on weekends at Dover
21  Downs.  I quit that job on May 31st.  That job was
22  quit before I went out on workman's comp.
23  Q.  2004 you quit?
24  A.  Mm-hmm.

72

1   Q.  What would you do at Dover Downs?
2   A.  I was what they call the cage cashier.  When
3   people had winnings, I would count the money out to
4   them of their winnings.
5   Q.  Okay.  And you were not terminated from your
6   position, correct?
7   A.  From where?
8   Q.  DCSE?
9   A.  From Child Support?
10  Q.  Correct.
11  A.  Child Support in Delaware?
12  Q.  Yes.
13  A.  I resigned, but after I resigned, I got a
14  letter from them telling me that I was dismissed.
15  Q.  But you indicated you had already quit?
16  A.  Pardon me?
17  Q.  You had already quit yourself, correct?
18  A.  I verbally contacted LaTanya Warren in August
19  and let her know I was not returning to child support.
20  Q.  Okay.  That was because you got a job and
21  accepted employment in North Carolina?
22  A.  Yes.
23  Q.  You wanted -- well, you needed to go down and
24  be with your son?

73

1   A.  I — yes.
2   Q.  Is that something you and your son had planned
3   for some period of time?
4   A.  Planned what?
5   Q.  On leaving, going to North Carolina.
6   A.  No.
7   Q.  It just came up suddenly?
8   A.  My son went to college in North Carolina.
9   Q.  Yeah.  I know.  What I'm trying to figure out
10  is, my understanding from your testimony is that
11  sometime in August 2005 you called LaTanya and told
12  her you resigned?
13  A.  Right.
14  Q.  You weren't coming back to work?
15  A.  Right.
16  Q.  The reason you told her was because you had
17  accepted a job in North Carolina?
18  A.  Right.
19  Q.  You were going to live with your son there?
20  A.  Right.
21  Q.  My question is, prior to you making that call
22  and resigning from state service, had you already made
23  arrangements before that with your son to go down to
24  North Carolina?

19  (Pages 70 to 73)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

---

74

1    A. No.
2    Q. It was a kind of a spur of the --
3    A. When I was offered the job at the beginning of
4    August was when I decided that I was going to take the
5    job. And that was when I decided to go to North
6    Carolina.
7    Q. Now, how much did they pay you in North
8    Carolina?
9    A. How much did they paid me?
10   Q. Mm-hmm.
11   A. My starting salary was 30,000 -- I think 30,200
12   a year or something like that.
13   Q. Is that more than you were making in Delaware?
14   A. Yes.
15   Q. So you resigned to get a better position and
16   you were getting paid more money in the North Carolina
17   position?
18   A. Yes. Delaware position -- I worked down in
19   Georgetown, Sussex County. When I went to Georgetown
20   and Sussex County, my salary was 20 -- it was higher
21   than 27,000. I did a lateral transfer from Georgetown
22   to come back to New Castle at the same job title and
23   the Division demoted my salary. It was a lateral
24   transfer. For what reason, I don't know.

---

75

1    Q. When was that? When was that move from Sussex
2    County?
3    A. When was the move from Sussex County?
4    Q. Mm-hmm.
5    A. In 2000 -- I think it's 2003. 2003 when I came
6    back from -- when I left Georgetown Child Support
7    office and came back up to New Castle.
8    Q. How long were you in the Georgetown Child
9    Support office?
10   A. Like eight months.
11   Q. And you asked to be laterally transferred to
12   New Castle?
13   A. Yes. I was -- it was a lateral transfer.
14   Q. You lived in Dover at the time, correct?
15   A. Yes. I left. I worked at customer service. I
16   interviewed out of customer service and got a job for
17   a caseworker in Georgetown, Georgetown Child Support
18   office. I went down to the Georgetown Child Support
19   office to work. I was there for like about eight
20   months, and I transferred back up to New Castle
21   because my daughter was seen by -- was being seen by a
22   specialist at A.I. duPont. That's the only reason why
23   I went back to New Castle customer service. God only
24   knows. I left that unit. I would have never gone

---

76

1    back, but my daughter was being seen by a specialist
2    of A.I. duPont at Wilmington. So it was beneficial
3    for me to be back up New Castle to get her to her
4    appointments than to be down in Georgetown.
5    Q. Let me just make sure I've got this straight.
6    When you first started working for the Division of
7    Child Support Enforcement, what was your work
8    location?
9    A. Stockton Building in Newark.
10   Q. That was in 2000?
11   A. Mm-hmm.
12   Q. Then you were transferred at your request to
13   Sussex, Georgetown?
14   A. Yes. Yes.
15   Q. You worked there for eight months?
16   A. Yes. I interviewed. They had a posting and I
17   interviewed for child support specialist job in
18   Georgetown.
19   Q. In 2000 who was your supervisor?
20   A. In Georgetown?
21   Q. When you worked at the Stockton Building.
22   A. Joyce Updike.
23   Q. Then you transferred to Georgetown?
24   A. Yes.

---

77

1    Q. You stayed there for about eight months?
2    A. Yes.
3    Q. Then you transferred to New Castle?
4    A. Yes. When I came back to New Castle, my
5    supervisor was still Joyce Updike and Brenda Annand.
6    And then Ms. Updike retired, and then it was just
7    Ms. Annand.
8    Q. How was it the two of them were your
9    supervisor?
10   A. Because we had two supervisors in the unit.
11   Q. I mean, would certain employees report to one
12   and certain employees report to the other one?
13   A. Not to the best of -- at that time when
14   Ms. Updike was there --
15   Q. Would you report to both of them?
16   A. Mm-hmm.
17   Q. That was in 2000, or is that when you came back
18   and -- when you were in Georgetown? What year?
19   A. I don't remember the exact year, sir. I think
20   it was 2002. I don't remember the exact year or
21   months that I worked in Georgetown.
22   Q. Then you returned back to New Castle sometime
23   in 2003?
24   A. Yes.

---

20 (Pages 74 to 77)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

78

1   Q.  Is that about right?
2   A.  Yes.
3   Q.  And when you returned it was Updike and Annand
4   that were your supervisors?
5   A.  Yes.
6   Q.  Now, how was the work environment in 2003?
7   A.  How was it?
8   Q.  Mm-hmm.
9   A.  With Ms. Annand, it was very harsh.  With
10  Ms. Updike not.
11  Q.  Have you ever filed any other EEOC complaints?
12  A.  No.
13  Q.  Have you filed any discrimination complaints --
14  A.  No.
15  Q.  -- with any employer?
16  A.  No.
17  Q.  Let me show you this document.  It's been Bates
18  stamped B00041.  It's one of the documents you
19  provided.  Do you see that B00041?  It appears to be
20  an e-mail with your writing on it, is that correct?
21  A.  Mm-hmm.
22  Q.  And my understanding is you sent an e-mail to
23  Ms. Annand on February 6, 2004, subject, testing and
24  interview schedule, correct?

79

1   A.  Mm-hmm.
2   Q.  It says, "Brenda, I am scheduled to test for a
3   state job position on 2/11/04 at the state fire school
4   in Dover from 9:00 a.m. to 11:30 a.m.  Also on
5   02/24/04, I'm scheduled to interview for a state job
6   posting.  I will need to leave work at 9:30 a.m. to
7   attend a 10:00 a.m. scheduled interview.  Would you
8   please mark your calendar for these dates?  You are
9   not in today.  So this is why e-mail was sent.  I will
10  be returning to work after scheduled events."
11      Did I correctly read what you e-mailed to
12  your supervisor?
13  A.  Mm-hmm.
14  Q.  Above that, is from Brenda Annand to Alice
15  Bailey?
16  A.  Mm-hmm.
17  Q.  And it says, "Could you please let me know when
18  Jackie arrived today to review her file and when she
19  left.  She sent me the e-mail below on 2/6/04 and
20  stated she had an interview for a state job 10:00
21  o'clock this morning and would be leaving at 9:30.
22  It's now 12:40 p.m. and she's still not back and I
23  haven't heard from her."
24      And then you wrote something at the

80

1   bottom.  What did you write?
2   A.  I said my reason for the visit to human
3   resources was not revealed to Ms. Annand.  I didn't
4   tell Ms. Annand why I was going to HR.  She knew that
5   I had the interview, which was with the division of --
6   Division of Visually Impaired.  I told her I had an
7   appointment at HR to discuss a concern.  For her to
8   put in here when did I arrive to review my file, I
9   didn't tell her what I was going to HR for.
10  Q.  Well, correct me if I'm wrong, but in your
11  e-mail February 6, 2004, it doesn't state anything
12  about you going to HR.
13  A.  No, it doesn't.
14  Q.  I'm confused.
15  A.  It doesn't -- no, it doesn't state that I am
16  going to HR, but Ms. Annand was informed.  Prior to me
17  going over to HR, I told her I had the interview and I
18  had an appointment at HR.  I basically went to HR
19  because I wanted to talk to someone about the negative
20  treatment and statements made by Ms. Annand toward
21  myself.
22  Q.  Okay.  But you agree with me that nowhere in
23  your e-mail does it say you're going to HR?
24  A.  No.  It doesn't.

81

1   Q.  What does it say?
2   A.  It says that I'm going to interview.
3   Q.  "I'm scheduled to interview for a state job
4   posting"?
5   A.  Mm-hmm.
6   Q.  That wasn't true?
7   A.  I did go to an interview.  I interviewed with
8   the Division of Visually Impaired and then, after I
9   left the interview, I had my appointment scheduled
10  over at HR.  That appointment was done in writing.  I
11  had to write a request in writing to come over and
12  view my file.  But I did have an interview on that
13  day.  That's not a false statement.  I had an
14  interview.
15  Q.  Okay.  So she was inquiring where you were
16  because you told her that you were going to be
17  interviewing on the 24th and it was 12:30.  At that
18  time she said she hadn't heard anything from you.
19  A.  Yeah.  But then, when she inquired, when did
20  I -- please let her know when Jackie arrived to review
21  her file.  I didn't tell her what I was going to HR
22  for.  I just told her I had an appointment at HR.  I
23  did not tell her I was going to review my personnel
24  file.

21  (Pages 78 to 81)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

82

1    Q.  Well, didn't you have to put in a written
2    request to review your personnel file?
3    A.  Which was faxed to LaTanya Warren.  It wasn't
4    faxed to Brenda Annand.
5    Q.  All right.
6    A.  That was basically — to review my file was
7    basically an excuse that I used to get over to HR to
8    address my concerns about Ms. Annand without her
9    having knowledge and knowing why I was going over
10    there and what I was doing.
11    Q.  All right.  Did you review your file?
12    A.  My file was not reviewed.
13    Q.  You wrote a letter requesting to review your
14    file, but you didn't actually review?
15    A.  The information I requested to see in my file
16    was not contained in my file they said.  What I asked
17    them to review in my file is, when you go on
18    interviews for employment, if an employer calls to get
19    a reference on you and it's provided by the agency, I
20    wanted to know what employers had called and
21    obtained -- to obtain a reference on me.  And I wanted
22    to know what was contained in the reference.  But when
23    I got over to HR, they said I would have to go back to
24    those employment agencies that I interviewed with to

83

1    get that information.
2    Q.  You wanted to know that, in your personnel
3    file, when a potential employer reference checked on
4    you, you wanted to know who it was that checked on
5    you?
6    A.  Yes.  I wanted to know who it was that checked
7    on me and what information was provided to them.  That
8    was what I was asking when.
9    Q.  Why is it you wanted to know that?
10    A.  Because of all my years of employment out of
11    the state government or in the state government, when
12    I got hired with Child Support, and the negative
13    relationship came about with Ms. Annand and myself, it
14    just seemed — and I was going repeatedly on
15    interviews trying to interview to get out of the
16    agency.  I was trying to get away from the situation
17    myself.  And I had been called back several times for
18    second interview, had even been contacted from
19    directors of agencies for second interviews, and I
20    wasn't getting the job.  So I was feeling that maybe
21    negative information was being provided to these
22    individuals or why I wasn't being considered for the
23    employment.
24    Q.  Is it possible you were not the better

84

1    candidate?
2    A.  That's — that's possible.  But I wanted to see
3    what was in my personnel file.
4    Q.  At B00053, it appears to be a DSC May 11, 2005,
5    hearing.
6    A.  Pardon me?
7    Q.  A transcript of a hearing.
8    A.  Mm-hmm.
9    Q.  Who is obligator?
10    A.  That is the non-custodial parent.  That's the
11    person —
12    Q.  That owes the child support?
13    A.  Yes.  That owes child support.
14    Q.  Who is Showard?
15    A.  She is the supervisor in the accounting unit.
16    Q.  And Kirk Ryan?
17    A.  That's the attorney that's hired, who's not a
18    state employee, but they are hired by Division to
19    facilitate these administrative hearings.
20    Q.  In this case, the obligator is telling -- at
21    the hearing, he's saying, the beginning of the middle
22    of the page, he says, "Okay.  Upon that conversation,
23    was that conversation with Jacqueline Berry?
24    "Yes."

85

1    The obligator says, "Okay.  She told me
2    verbally on the phone, it made no difference if I were
3    to request an administrative hearing because DSC
4    already made a decision to attach the tax, to
5    intercept them."
6    Do you see that?
7    A.  Mm-hmm.
8    Q.  Is that something you said?
9    A.  No, sir.
10    Q.  If you say something like that, that would be
11    wrong, right?
12    A.  It would be exactly wrong, sir, because I would
13    violate basically their rights.  The Division has to
14    allow them the opportunity to come in and show burden
15    of proof of why they feel their taxes should not be
16    intercepted.
17    Q.  Then there's another document, B00055.  It's
18    another transcript of another hearing, is it not?
19    A.  Mm-hmm.
20    Q.  And the obligator is telling the hearing
21    officer, "There's one lady that keeps calling me up
22    telling me I shouldn't come to this and I shouldn't
23    waste my time and I shouldn't take a day off.  And I
24    don't know why you're doing it.  She called me like

22 (Pages 82 to 85)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

86

1   seven times in two weeks."
2       And then the hearing officer, Kirk Ryan,
3   asking, "Do you know who that is?"
4   A.  Mm-hmm.
5   Q.  "That would be helpful to know because you have
6   the wrong information."
7   A.  Yes.
8   Q.  Her name is, and they -- he looks at the paper
9   and he say that's you, correct?
10  A.  Pardon me?
11  Q.  He identified you as being the one?
12  A.  No.  Ms. Showard, who led the witness or the
13  obligor, she's looking at the paper and says that
14  that's Berry.  There were two individuals in the
15  accounting unit.  There was a Rose Bailey and
16  Jacqueline Berry.  So each and every time when she led
17  these people -- and this one here, this administrative
18  hearing here never took place.
19  Q.  It never took place?
20  A.  No, sir.
21  Q.  Why did it never take place?
22  A.  The obligor never met with a Kirk Ryan.  The
23  obligor only met with Ms. Showard.  So I was wondering
24  how was there a recording of a tape of an

87

1   administrative hearing that was held -- the obligor
2   ever never had administrative hearing.
3   Q.  You're saying there was no such hearing?
4   A.  No, sir.
5   Q.  So this was a forgery?
6   A.  I don't know what you want to call it, but no
7   administrative hearing took place on this here.
8   Q.  Why is that you say that?
9   A.  Because I interviewed the obligor.
10  Q.  What did he say?
11  A.  That he met with a Ms. Showard.  I asked, was
12  there anyone attending this meeting?  And the obligor
13  stated, no, he met with a short, white, blonde-haired
14  lady.  That was Ms. Showard.  I knew who he was
15  talking about.  There was no Kirk Ryan present at such
16  a meeting.  There was no administrative hearing held.
17  All Ms. Showard did was explain to the obligor the
18  account statement that I had sent to the obligor in
19  the mail.  She explained to him how to read the
20  account statements, which I had suggested to him to
21  come in and sit down with someone in accounting to go
22  over and read that account statement with him.  He
23  would get a better hand with someone showing him than
24  trying to explain it to him over the telephone.

88

1   Q.  When was it that you interviewed this obligor?
2   A.  About two weeks ago.  It was after I sent these
3   documents to you.
4   Q.  You interview this guy two weeks ago?
5   A.  Yes, I did.
6   Q.  How did you get his telephone number?
7   A.  Pardon me?
8   Q.  How did you get his telephone number?
9   A.  How did I get his telephone number?
10  Q.  Yeah.
11  A.  You look on the case.
12  Q.  Did you -- is that --
13  A.  I have this.
14  Q.  What's the source of these documents?  Where
15  did you get these?
16  A.  Where did I get those documents?
17  Q.  Mm-hmm.
18  A.  The day that Ms. Annand gave me my performance
19  review --
20  Q.  Mm-hmm.
21  A.  -- she gave me these to copy.
22  Q.  Okay.
23  A.  I went to the copier and copied them.  But
24  someone had took them out of the copier.  You want to

89

1   find e-mails that I showed you where I tried to obtain
2   this information from Ms. Dianne Walters, who she said
3   she couldn't find it and they would not give it to me.
4   One of my co-workers had retrieved my documents out of
5   the copier and gave them to me at a later time.  That
6   was how I got a copy of this stuff.  It was used on my
7   performance review.
8   Q.  So you're saying this April 29, 2005, hearing
9   never took place?
10  A.  It never took place.
11  Q.  Based on your conversation, your --
12  A.  With the obligor.
13  Q.  Now, the obligor's name is not here, is it?
14  A.  Hmm?
15  Q.  The obligator's name is redacted?
16  A.  No.  It's on -- Mr. Sherwood.
17  Q.  I mean, were you instructed to contact these
18  people after the fact --
19  A.  Pardon me?
20  Q.  -- to verify this?
21  A.  Was I instructed to contact him after the fact
22  to verify it?  No.
23  Q.  Why did you do that?
24  A.  Because I sent you the documents.  I had called

23  (Pages 86 to 89)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

---

90

1 your secretary and told her that I had an addendum. I
2 called because I knew that I did not say this to this
3 man. And that was why I called him.
4    Q. Well, is it possible that the gentleman you
5 talked to after the case forgot that he was at a
6 hearing?
7    A. If he had an administrative hearing, sir,
8 that's like a formal process. It's recorded. I don't
9 think that he or anyone would forget that they were at
10 a hearing.
11    Q. Now, there was another transcript for May 13th,
12 2005, request for continuance, teleconference?
13    A. Which number are you looking at?
14    Q. It's B00057.
15    A. Okay.
16    Q. Did this happen?
17    A. This is with Mr. Faron Daniels, who states I
18 say his name funny.
19    Q. And he is saying you're telling him certain
20 things, correct?
21    A. Pardon me?
22    Q. He's reporting in this teleconference that you
23 told him certain things. It's underlined what you
24 purportedly told him, correct?

---

91

1    A. Which one are you looking at again, sir?
2    Q. It starts at page 57 and goes to 58, I believe.
3    A. Okay. This same person here --
4    Q. It appears to be the same person, correct?
5    A. I guess.
6    Q. And underlined is what purportedly -- maybe
7 these are two different teleconferences. I don't
8 know.
9         Anyway on the first one I showed you, 57,
10 are you saying you didn't say those things he's saying
11 you said?
12    A. I'm not -- no. I didn't say this to this guy.
13    Q. So what he's reporting is false?
14    A. Yeah. What she says that -- I told her that
15 the guy had -- she's saying I told her that
16 Mr. Daniels, Faron Daniels had stated that he wanted
17 to be deleted from administrative hearing. If you
18 look at these case notes here, there was a case note
19 that I did send to Ms. -- to the tax unit telling them
20 that he wanted to be deleted -- let me see. There's
21 one where he wanted to be deleted, and then there was
22 one where he called back and he asked to proceed with
23 the tax administrative hearing, the latest one on page
24 00076.

---

92

1    Q. Mm-hmm.
2    A. On this one here, he changed his mind and he
3 wanted to proceed with the tax administrative hearing.
4 But the complaint was that I sent a request that the
5 man wanted to be deleted. At one time did he want to
6 be deleted because I have the e-mail here. He wanted
7 to withdraw. 0079. I have on here that he's
8 requesting to withdraw from the tax administrative
9 hearing. But then 0076, he's asking to proceed.
10    Q. Okay. Now, would you look at B00058? This is
11 another teleconference hearing, correct?
12    A. Mm-hmm.
13    Q. And they underlined, I believe, what they
14 believe what this person is telling the hearing
15 officer what he was told by you?
16    A. I read everything what these accusations are so
17 called made by me, but I did not say this to these
18 individuals.
19    Q. Okay. So this person as well is not telling
20 the truth, is that correct?
21    A. I did say that to the person.
22    Q. So if he's saying you said that, that's not
23 correct; that's a lie?
24    A. That's not correct.

---

93

1    Q. So he --
2    A. I never made an allegation to anybody trying to
3 distract them to come in for an administrative hearing
4 because I know that's their right, that's their way of
5 proving that their taxes should not be intercepted. I
6 never try to distract anybody from coming in to Child
7 Support to have an administrative hearing.
8    Q. Okay. Then the next document, B00059, looks
9 like a request for an administrative hearing.
10    A. This is the letter that Ms. Showard said the NC
11 sent in stating that he wanted an administrative
12 hearing, stating that I had informed her that he
13 wanted to withdraw. And as I said, the case notes do
14 show where I did send her a case note that he
15 requested to withdraw but then he called back and
16 wanted to proceed. So there's a case note to document
17 and justify that.
18    Q. He's complaining that, according to him, "I was
19 asked by Jackie Berry, Newark office, if I would like
20 to postpone this hearing until they received my fax
21 (copies of my stubs) and reviewed my case. I agreed
22 to this, hoping this would put an end to this
23 bookkeeping error. I received a letter from DCSC on
24 March 19th indicating I had discharged my hearing. My

---

24 (Pages 90 to 93)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

94

1  account was being transferred to a collecting agent.
2  This was a falsehood. I never discharged the hearing.
3  I respectfully request a hearing to resolve this
4  issue."
5      In other words he's saying that you told
6  him that you were going to postpone the hearing until
7  he could collect his — and instead, it indicates that
8  you discharged the hearing. It says he never wanted
9  that.
10  A.  He never wanted a hearing?
11  Q.  He never wanted you to discharge the hearing.
12  A.  I don't have a right to discharge anything.
13  When someone makes a request to be discharged from a
14  hearing, it goes to Ms. Showard. I don't discharge
15  anything. I don't — I didn't have the right to do
16  that. But as I said, if you look at the case notes,
17  at one point, the NCP had requested to withdraw. But
18  then he called back again and requested to proceed.
19  There are case notes to justify it.
20  Q.  Why would Mr. Showard make a false statement
21  about you? Do you know him?
22  A.  Ms. Showard?
23  Q.  You said --
24  A.  Why would who?

95

1  Q.  Under B00061 you say, "Document was printed to
2  support false complaints made by Ms. Showard."
3  A.  Why -- you're asking me why would Mr. Sherwood
4  make a false complaint?
5  Q.  What did you write? What does your handwriting
6  on that document say?
7  A.  "Documents I printed to support false
8  complaints made by Ms. Showard.
9  Q.  Okay.
10  A.  So the complaints made by Ms. Showard were in
11  that so-called administrative hearing with Kirk Ryan
12  present that Mr. Sherwood say did not take place.
13  There was no administrative hearing held.
14  Q.  I'm confused. Ms. Showard is merely one of the
15  persons in the transcript. She's not making any
16  statements about what you said to anyone. She's
17  asking him.
18  A.  Exactly.
19  Q.  How is it her false statement then?
20  A.  Pardon me?
21  Q.  How would it be her false statement?
22  A.  How is it her false statement?
23  Q.  Yeah. That's what I don't understand. In your
24  document -- and I'm talking about B00062 --

96

1  A.  Because --
2  Q.  -- or 61. I'm sorry.
3  A.  The allegations made in the administrative
4  hearing were used in my performance review. She's
5  stating — Ms. Showard wrote a letter to Ms. Annand
6  and Ms. Walters, stating that she got complaints from
7  these individuals, and she couldn't have gotten the
8  complaint from someone if the administrative hearing
9  didn't take place.
10  Q.  Suppose when you interviewed the guy he was
11  scared of you and didn't want to talk about so he told
12  you there was no hearing?
13  A.  That may have been the case, but if the
14  Division of Child Support has an administrative
15  hearing, it was recorded. They have that recording of
16  that hearing with the guy making the statements.
17  Q.  So if I get the tape and there was, in fact, a
18  hearing and you heard those things and it's an accurate
19  transcript, what would you say then?
20  A.  That there's administrative hearing that took
21  place and accurate transcript, basically, he can
22  attest in the witness, you know, to what is said on
23  that transcript.
24  Q.  Ms. Showard is not your supervisor, is she?

97

1  A.  No. She was when I worked in accounting, just
2  alternate duty assignment for two months that they had
3  me over there, and I was --
4  Q.  That was alternate duty assignment they gave
5  you?
6  A.  Yeah.
7  Q.  When was that they gave you that?
8  A.  That wasn't until 2005, June 2005 or something.
9  Q.  Was that because of your limitations?
10  A.  Yes.
11  Q.  So they did give you an alternate duty,
12  temporary alternate duty?
13  A.  For two months in the accounting unit
14  eventually they did.
15  Q.  Okay.
16  A.  It was like a year went by, you know.
17  Q.  Is that because somebody else had the job
18  before?
19  A.  In accounting?
20  Q.  Well, who was the tax intercept person before
21  you?
22  A.  Before --
23  Q.  You got this temporary assignment for two
24  months.

25  (Pages 94 to 97)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

98

1    A.  Mm-hmm.
2    Q.  Who was doing it before you?
3    A.  I don't know who was doing it before me.
4    Q.  Could it be that you only got it when it became
5    open?
6    A.  I don't know.
7    Q.  To your knowledge, document B00086, there's a
8    letter to you dated October 22nd, 2004.
9    A.  Mm-hmm.
10   Q.  What is this letter about?
11   A.  What is this letter about?
12   Q.  Mm-hmm.
13   A.  It's saying they are recommending my dismissal
14   from my position.
15   Q.  And what was it for?  Why were they
16   recommending your dismissal?
17   A.  It says, "Due to my unavailability for work."
18   Q.  Is it true that you hadn't been to work in
19   quite some time?
20   A.  I was out for carpal tunnel, both my hands.  I
21   had surgery.
22   Q.  He indicates in the letter on the second page,
23   the end of the first paragraph, the top, "Your absence
24   from September 20, 2004, to date are unauthorized and

99

1    subject to disciplinary action."
2    Were they unauthorized?
3    A.  No, sir.  What had happened, Ms. Annand said
4    that I had left work and abandoned my job and she did
5    not know what was going on with me while I was out on
6    workman's comp.  I was told when I was put out on
7    workman's comp that -- by Alice Bailey because she was
8    informed that I had an attorney, that any
9    communication or anything had to be with the attorney
10   and not myself.  So all documents that were pertaining
11   to my workman's comp injury were sent to my doctor,
12   which my doctor sent them to the state's legal rep for
13   them.
14   But she had said that I had abandoned my
15   job and she didn't know what was going on with me or
16   anything.  So I ended up having a predecision hearing
17   or something to come back to work, and it was narrowed
18   down that miscommunication, lack of communication
19   between the legal reps are why such a statement was
20   put in there.
21   Q.  Did you return to work shortly thereafter?
22   A.  Yes, sir.
23   Q.  For how long?
24   A.  How long did I return to work?

100

1    Q.  Mm-hmm.
2    A.  I don't know how long.  You want to know how
3    long it was after this letter that I returned or how
4    long --
5    Q.  Yeah.
6    A.  -- when I returned.
7    Q.  When did you return to work after that letter?
8    A.  I don't -- I don't recall the date, sir, when I
9    initially returned to work because there were several
10   occasions where I would return to work but then go
11   back to the workman's comp carrier physician that was
12   treating me and he would change something on my
13   prescription and then I would be put back out of work.
14   I had a predecision hearing on November
15   19, 2004, to return me back to work.
16   Q.  Turning to B00097 through B00099, just tell us
17   what these are.
18   A.  This is a copy of information that Ms. Santana
19   used with filing her complaint.
20   Q.  Did she give it to you?
21   A.  Pardon me?
22   Q.  Did she give it to you?
23   A.  Ms. Santana?
24   Q.  Yes.

101

1    A.  Yes.
2    Q.  How are your hands now that you've had the
3    surgery for release done for the carpal tunnel?
4    A.  I'm still diagnosed with carpal tunnel, sir.  I
5    followed up with a physician and had another nerve
6    conduct study in North Carolina.  And results were
7    revealed that I have carpal tunnel and they are
8    recommending a second surgery.  After what I went
9    through with the first surgery, I just haven't
10   considered having that second surgery.
11   Q.  So you're getting the symptoms back?
12   A.  I -- even when I had the first surgery, I
13   always slightly did have the symptoms and which my
14   doctor, treating physician here had recommended and
15   referred me to go to voc rehab and had recommended a
16   second surgery too, but you know, I -- I just haven't
17   considered having that done yet.
18   Q.  Turn your attention to B00125.  It's an e-mail
19   from you to your supervisor Brenda Annand.
20   A.  Mm-hmm.
21   Q.  It's "request of my daughter's treating doctor,
22   move to Kent County employment."  You indicate -- you
23   don't call her Brenda, you call her Brend.
24   A.  No.  The A is missing.

26 (Pages 98 to 101)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

102

1  Q.  I mean, is that just a mistake?
2  A.  Mistake.
3  Q.  Okay. "Brenda, per visit on 2/10/04, my
4  daughter's doctor wrote another request for me to be
5  employed closer to work due to my daughter's medical
6  condition." And then you recount, "per our discussion
7  of November 13, '04, and one in January 6, '04, I was
8  informed by you that the request made by my daughter's
9  doctor would not be granted. Due that I received the
10 same request again, I'm requesting in writing from you
11 of why such request cannot be granted. Please provide
12 me with such documentation at your earliest
13 convenience. I did not discuss letter received
14 2/10/04 with you due to same concern already discussed
15 twice and not granted."
16      Then she responded to your e-mail, did she
17 not?
18 A.  Mm-hmm.
19 Q.  And what did she say?
20 A.  She said that I "applied and was hired to be a
21 child support specialist 1 in the customer service
22 unit, which is located here in New Castle. There was
23 no customer service unit position located in Kent
24 County is an automated call center is ran in the

103

1  Churchman's building. At this present time there are
2  also no CTS 1 vacancy in Kent County. If one becomes
3  available, you can follow normal procedures and apply
4  for it."
5      Fully aware of that, that I can apply, but
6  if not given the opportunity to apply, if the
7  positions become available and they are not posted,
8  you're not given the opportunity to apply.
9      As well as saying that I was hired to be a
10 child support specialist 1 in the customer service
11 unit, I was hired by the agency as a child support
12 specialist 1, which means, within the Division of
13 Child Support, I can go to any agency within any unit
14 within that agency if I qualify. It's not necessarily
15 saying when I got hired by Child Support that I'm just
16 in customer service because, if that was the case,
17 other co-workers that there were hired in customer
18 service would not be in the other units with an agency
19 today themselves. It would just hired in customer
20 service.
21 Q.  Did they apply for those transfers, do you
22 know?
23 A.  Pardon me?
24 Q.  The other employees that transferred from the

104

1  customer service unit, did they apply for those
2  positions?
3  A.  Some applied and some were just lateral moved.
4  Q.  At their request?
5  A.  Pardon me?
6  Q.  At their request?
7  A.  It could have been at their request or not. I
8  don't know.
9  Q.  Well, you were laterally moved, were you not,
10 at your request?
11 A.  I interviewed for the position back up in New
12 Castle and was offered the position and took the
13 lateral move back up.
14 Q.  You applied for it or you made a request for
15 it?
16 A.  I applied. I interviewed.
17 Q.  So you've done it before; you've applied and
18 been laterally moved to transfer, correct?
19 A.  Yes, sir.
20 Q.  So if you wanted to be transferred to Kent
21 County, you could do the same thing, right?
22 A.  Apply if you're given the opportunity to apply.
23 They had two openings. They never posted the
24 positions. They just did in-house moves that no one

105

1  was aware even if they knew of.
2  Q.  There's nothing that violates the merit rules
3  about that, is there?
4  A.  I don't know.
5  Q.  Would you turn to B00126.
6  A.  Mm-hmm.
7  Q.  This is a letter from Linda --
8  A.  Caballero.
9  Q.  She's a doctor at the Nemours Children's
10 Clinic --
11 A.  Yes.
12 Q.  -- in Dover, correct?
13 A.  Yes.
14 Q.  And who is it addressed to?
15 A.  Chuck Hayward and Mr. Vince Meconi.
16 Q.  And the doctor is saying essentially that he's
17 been requesting a change of employment site so that
18 you may be close to your daughter to bring her into
19 emergency appointments and have requested this
20 position change since January. At this point, there
21 is no one to honor this medical necessity letter.
22 Shanice Morris -- is that your daughter?
23 A.  Mm-hmm.
24 Q.  "Has medical conditions and necessitates her

27 (Pages 102 to 105)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

106

1    mother being nearby and easily available in order to
2    take her to emergency appointments or to the ER. Her
3    diagnosis is considered a critical chronic condition.
4    It's medically necessary for her mother to be
5    available, present for her medical appointments. Due
6    to HIPPA, I do not have to divulge her diagnosis, but
7    she does have medical conditions that require her
8    presence of her mother. Your prompt attention to this
9    matter is greatly appreciated. Any further questions
10   or comments, you can direct them to me." And it gives
11   her name and phone number, correct?
12       A.  Mm-hmm.
13       Q.  And who is it addressed to?
14       A.  Who's the letter addressed to?
15       Q.  Yes.
16       A.  Chuck Hayward and Vincent Meconi.
17       Q.  And who is Chuck Hayward?
18       A.  He is director of Child Support.
19       Q.  Who is Vincent Meconi.
20       A.  Secretary of DHSS.
21       Q.  Then at the bottom there's some handwriting.
22   Is that your handwriting?
23       A.  Yeah.
24       Q.  What's it say?

107

1        A.  It says, "This document was withheld from EEOC
2    Philadelphia district office as evidence to my
3    allegations of discrimination."
4            This document here was not turned in to
5    the federal EEOC office. I obtained all documents at
6    child support used to attest the allegations I made
7    against them under the Freedom of Information Act and
8    this is one document that they withheld and did not
9    give them. It was not in the information.
10       Q.  Then there was an e-mail at B00127 from Dianne
11   Walters, correct?
12       A.  Mm-hmm.
13       Q.  And she is your supervisor's supervisor,
14   correct?
15       A.  Yes.
16       Q.  And she's referring to the letter --
17       A.  Mm-hmm.
18       Q.  -- from doctors. She says, "Jackie, I wanted
19   to let you know that Chuck is in receipt of your
20   doctor's letter requesting that you be allowed to work
21   from the Kent County office. I'd like to meet with
22   you and Brenda to discuss this situation. When you
23   return to work tomorrow, please see me to set up a
24   time that is convenient."

108

1            That's dated April 7, 2004, correct?
2        A.  Mm-hmm. Yes.
3        Q.  The next document, B00128, appears to be
4    memorandum written by --
5        A.  Dianne Walters.
6        Q.  To you, correct?
7        A.  Yes.
8        Q.  That's dated April 12, 2004, and the subject is
9    "transfer to Kent County."
10       A.  Yes.
11       Q.  And she recounts that you were hired into the
12   "customer service unit as a child support specialist,
13   that this is presently housed in the New Castle County
14   office. We are unable to move you as your doctor has
15   requested. There are no vacancies at this time in the
16   Kent county office."
17       A.  Yes.
18       Q.  "If there were, you could apply for a position
19   to another unit, hence allowing for your transfer."
20       A.  Mm-hmm.
21       Q.  "In an effort to accommodate your request, the
22   director did canvass the Dover office to see if anyone
23   would be interested in a switch of positions. Again,
24   unfortunately, there is no one that was interested in

109

1    such a switch. As we discussed, should you wish to
2    pursue employment in Kent County, I'm sure with the
3    lifting of a hiring freeze, positions will be opening
4    that you could apply for inside the division as well
5    as outside."
6            Then she closes by saying, "Until that
7    time both Brenda and I will work with you to
8    accommodate your child's health care needs. As we are
9    both parents, we understand we need to put our
10   children first in some instances. Feel free to
11   discuss this with either Brenda or myself at any
12   time."
13           Is that how she closes with?
14       A.  Yes, sir.
15       Q.  Was there a hiring freeze on at this time,
16   prior to this?
17       A.  May have been a hiring freeze at that time. My
18   daughter started right -- my daughter's doctor started
19   writing letters to the Division of Child Support,
20   which the first letter they received requesting for a
21   transfer to Kent County was on October 22nd, 2003.
22   This letter dated by Ms. Annand is April 12, 2004. So
23   there had been ample amount of time that had went by
24   with my daughter's doctor repeatedly writing requests.

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

110

1    Q.  Do you understand that there is no legal
2  obligation they have to transfer you to Kent County?
3    A.  I thoroughly understand.
4    Q.  You were asking them to do that and they were
5  trying to tell you, well, here's the things you can do
6  to get transferred to Kent County, correct?
7    A.  Right.  They said that I could apply, but like
8  I said, when openings became available, they weren't
9  posted giving me the opportunity to apply.
10    Q.  Who would --
11    A.  I know they are not under any preferential --
12  you know, give me any preferential treatment to move
13  me to Kent County.
14    Q.  Right.  Now, my point is, who's not posting
15  these positions that are opening in Kent County?
16    A.  I guess it has to do with HR.  I don't know
17  who's -- I don't know who is responsible for posting
18  the positions.
19    Q.  Was it Brenda Annand?
20    A.  Was it Brenda Annand?
21    Q.  Is this the reason they are not posting them in
22  Kent County?  Do you have any information that it was
23  Brenda Annand that made it so it wouldn't be posted?
24    A.  I have no knowledge, sir, why, when positions

111

1  became available in Kent County, they were not posted.
2    Q.  Did Dianne Walters have something to do with
3  it?
4    A.  I'm not saying who had anything to do with it.
5  I'm just saying, when available positions became
6  available in Kent County, they were not posted
7  allowing me the opportunity or anyone else with the
8  Division of Child Support to apply in interviews for
9  such postings.
10    Q.  All right.
11    A.  And it was not until the agency even really
12  addressed the concern of me going to Kent County until
13  my daughter's doctor sent this letter here to Chuck
14  Hayward and Vincent Meconi, which at the time I didn't
15  even have knowledge and know that she was doing that.
16  But it was the agency didn't even really address the
17  concern until that letter that was received.
18    Q.  In fact, you had discussed it with Brenda prior
19  to that?
20    A.  That I discussed it with Brenda and that's the
21  only -- she didn't take it any further or pursue it
22  any further or anything.
23    Q.  She did correctly tell you that the customer
24  service unit doesn't have positions in Kent County,

112

1  correct?
2    A.  Which I'm fully aware.
3    Q.  Okay.  And she did indicate, however, that you
4  could, of course, always apply for a position if it
5  became open, some other position became open?
6    A.  If --
7    Q.  You say if you knew about them.
8    A.  If the positions, when they became available
9  were posted, allowing me the opportunity to apply.
10    Q.  And you and I, through prior discussion, have
11  determined that that's not Brenda Annand's fault they
12  weren't posted?
13    A.  I'm fully aware of that.
14    Q.  Okay.  And it's not Dianne Walters fault they
15  are not posted?
16    A.  I'm fully aware.  But for either -- for either
17  one, Brenda or Dianne, to tell me that I am hired as a
18  child support specialist in customer service unit,
19  when you're hired at Child Support, it doesn't label
20  you to a direct unit.  You are hired as a child
21  support specialist 1, which any department in that
22  agency that you qualify for or in any county that you
23  qualify for, you can go there and work.
24    Q.  In other words, you're free to transfer if

113

1  there's an opening?
2    A.  Yes.  Yes.
3    Q.  And you yourself have already done that at
4  least once, maybe twice?
5    A.  Pardon me?
6    Q.  You've transferred yourself?
7    A.  Yes.
8    Q.  On two occasions?
9    A.  I applied and interviewed.
10    Q.  Right.
11    A.  Yes.
12    Q.  And that's always available to you, correct?
13    A.  It's not always available because when the
14  openings came in the Kent County office, they were not
15  posted allowing me the opportunity to apply.
16    Q.  Okay.  I understand.
17        The next document is B00133 to B00137,
18  B00138 -- I don't know.  No.  Maybe that's a different
19  document.
20        The first document is -- it's Internal
21  Revenue Service tax return transcript?
22    A.  Mm-hmm.
23    Q.  What is this?
24    A.  It's my tax file and status for 2005.

29  (Pages 110 to 113)

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

114

1   Q. Did you file electronically?
2   A. Yes.
3   Q. Is that the only tax return you have?
4   A. That was the only one that I — I filed
5   electronically.
6   Q. Okay.
7   A. I had to call them to have them send me a copy
8   of that.
9   Q. Now, would you explain to me what B00138 --
10  A. What this is, this is a print-out --
11  Q. Wait a second. Let me get done the question.
12  Okay?
13       -- through B00152, what are those things?
14  A. This is a print-out that was sent to me from
15  Coventry. I had medical — I had to have a surgery
16  while I was out on workman's comp. Medically
17  necessitated that I had to have that surgery. The
18  bill was paid by my — Coventry, the insurance
19  carrier. But seven months later someone from Coventry
20  informed me that someone from HR at Child Support
21  called and told them to reverse the bill for covered
22  charges for services on August 2nd, 2004.
23  Q. Did that have to do with your carpal tunnel?
24  A. No.

115

1   Q. Now, you recall in my discovery request to you
2   I asked to list your health care providers and
3   practitioners for the last number of years, and I
4   think you only told me about Dr. Crain, correct?
5   A. No. You have more than Dr. Crain. It's
6   number 12.
7   Q. All right.
8   A. 11 and 12.
9   Q. Okay. So you told me about Dr. Patel's
10  treatment related to hypertension, is that what it
11  says?
12  A. Mm-hmm.
13  Q. Dr. Crain. And then you answered "objection to
14  all health care providers due to information is
15  irrelevant and has no bearing on this case," correct?
16  A. You have CNMRI, that's Dr. Varipapa.
17  Q. Where is that?
18  A. Page 11.
19  Q. Yes.
20  A. Where it says answer, that's a doctor's office
21  there.
22  Q. CNMRI?
23  A. Mm-hmm. It's a neurologist.
24  Q. Okay. CNMRI is actually the name of a doctor

116

1   or is it just --
2   A. It's Dr. Varipapa. That's the name of the...
3   Q. What have you been treating and how long have
4   you been treating with him?
5   A. How long?
6   Q. Mm-hmm.
7   A. I don't know the time frame how long I had
8   treated with them, but it was in 2004 that he put me
9   on anxiety medication.
10  Q. Okay. How long had you been seeing him before
11  he put you on anxiety medication?
12  A. How long had I been seeing him?
13  Q. Yes.
14  A. I can't give you an exact time frame as far as
15  month or years, but I guess I can say about a year. I
16  don't --
17  Q. What were you seeing him for before he
18  prescribed your anxiety medication?
19  A. This is the doctor that did the nerve
20  conduction study for the carpal tunnel.
21  Q. Okay. And he also gave you anxiety medication?
22  A. Yes, sir.
23  Q. What about Dr. Ashok Patel?
24  A. This is medication I was on for hypertension.

117

1   Q. How long have you been seeing him?
2   A. For years.
3   Q. In other words, you've had hypertension for
4   years?
5   A. You asked me how long had I been seeing him.
6   Q. Yes.
7   A. He's been my family doctor for some time. I
8   was placed on hypertension medication when I came to
9   Child Support.
10  Q. In 2000?
11  A. I'm not going to say in 2000. It was when I
12  started working for Child Support. I know it was when
13  I was placed on hypertension medication. Since I've
14  left Child Support, I'm no longer on hypertension
15  medication.
16  Q. Now, I asked you a question 5. It's at
17  page 12. What other lawsuit or administrative bodies
18  or proceedings have you had or you've objected and
19  said, "Other requested information is irrelevant. No
20  bearing on this case." Is that correct? Am I reading
21  correctly your response?
22  A. I put the U.S. Equal Employment Opportunity.
23  Q. Right.
24  A. Right. That's the only one I put. I didn't

Berry v. State of Delaware, Division of Child Support
Jacqueline D. Berry - Niedzielski

118

1  put the workman's comp one from back in 1997 on here
2  with DHCI, but...
3  Q.  Well, other than that those two -- so this EEOC
4  thing that you're identifying here is the one for
5  which you brought this lawsuit, correct?
6  A.  Yes.
7  Q.  Now, other than that, what other lawsuits have
8  you been a party to?
9  A.  The only other one I had was when I had the
10  workman's comp injury years ago at DHCI.
11  Q.  And there was nothing else; there's no other
12  lawsuits?
13  A.  No.
14  Q.  And you never filed a discrimination complaint
15  before?
16  A.  Never.
17  Q.  How are you presently supported?
18  A.  My son.
19  Q.  He sends you money?
20  A.  My son.
21  Q.  Sends you money?
22  A.  Mm-hmm.
23       And I get child support for my daughter.
24  Q.  When you left the New Jersey Division of Child

119

1  Support --
2  A.  New Jersey?
3  Q.  Yes. I'm sorry. North Carolina.
4       Did you get evaluations done when you were
5  at North Carolina?
6  A.  Yes sir.
7  Q.  How were your evaluations?
8  A.  I got -- their evaluations or rating is below,
9  good, very good, and outstanding. My evaluation was
10  very good.
11  Q.  And you will not sign these authorizations for
12  the release of information?
13  A.  No, sir.
14  Q.  All right. That's all the questions I have for
15  right now. Obviously, if you had signed these
16  authorizations and releases to me, I would have been
17  able to get some records and I would have been asking
18  about those additional records.
19  A.  I have already contacted my physicians to get
20  my records from my physicians for you.
21  Q.  Yeah. But see, I have a right under the law to
22  get them myself --
23  A.  Mm-hmm.
24  Q.  -- but you refuse to sign the authorizations.

120

1       Now, because of that, discovery closes
2  tomorrow in this case.
3  A.  Mm-hmm.
4  Q.  And I will need to go to the Court to get the
5  Court to force you to sign these authorizations for
6  me.
7  A.  Okay.
8  Q.  So then I will need additional time to do
9  discovery?
10  A.  Okay.
11  Q.  So what's your position on an extension of time
12  to continue discovery? Do you oppose it or are you
13  for it or what?
14  A.  Say that again, please.
15  Q.  I want to know what your position is. I'm
16  going to request an extension of time to complete
17  discovery. Because I've not been able to get these
18  hospital, doctor's records, and employment records?
19  A.  Mm-hmm.
20  Q.  And what I want to know is, what's your
21  position regarding my request for an extension of the
22  discovery period?
23  A.  I will oppose it.
24  Q.  You will oppose it?

121

1  A.  Mm-hmm.
2  Q.  Okay. That's fine. Thank you very much.
3  A.  Okay.
4  Q.  Oh, listen, you have a right to read and sign,
5  if you wish, your transcript. In other words, if you
6  do that, they would tell you when to come in and to
7  review the transcript in their office. You would
8  come, look it over. You can make changes to the
9  transcript. You can sign, and that would be included
10  in the transcript, or you can say, "I'm going to waive
11  that right."
12  A.  I don't want to do that.
13  Q.  It's up to you.
14  A.  I'm not going to waive my right to --
15  Q.  To read the transcript?
16  A.  Right.
17  Q.  Okay. After you read the transcript, did you
18  want to buy a copy?
19  A.  Yes.
20  Q.  There you have it.
21       (Deposition ended at approximately
22  3:50 p.m.)
23
24

31 (Pages 118 to 121)

Berry v. State of Delaware, Division of Child Support

122

```
 1
 2
 3
 4
 5
 6
 7
            REPLACE THIS PAGE
 8
 9          WITH THE ERRATA SHEET
10
            AFTER IT HAS BEEN
11
12          COMPLETED AND SIGNED
13
            BY THE DEPONENT.
14
15
16
17
18
19
20
21
22
23
24
```

123

```
 1    State of Delaware )
                       )
 2    New Castle County )
 3
 4         CERTIFICATE OF REPORTER
 5
           I, Ann M. Calligan, Registered Merit
 6    Reporter and Notary Public, do hereby certify that
      there came before me on the 27th day of February,
 7    2007, the deponent herein, JACQUELINE D. Berry, who
      was duly sworn by me and thereafter examined by
 8    counsel for the respective parties; that the questions
      asked of said deponent and the answers given were
 9    taken down by me in Stenotype notes and thereafter
      transcribed by use of computer-aided transcription and
10    computer printer under my direction.
11         I further certify that the foregoing is a true
      and correct transcript of the testimony given at said
12    examination of said witness.
13         I further certify that I am not counsel,
      attorney, or relative of either party, or otherwise
14    interested in the event of this suit.
15
16
17             Ann M. Calligan, RMR
               (Certification No. 186-RPR)
18             (Expires January 31, 2008)
19
      DATED: March 15, 2007
20
21
22
23
24
```

32 (Pages 122 to 123)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**


JACQUELINE D. BERRY,       :
                              :
          Plaintiff,        :
                              :
     v.                    :     C.A.No. 06-217-GMS
                              :
STATE OF DELAWARE,       :
DIVISION OF CHILD SUPPORT,    :
                              :
          Defendant.     :


## <u>DECLARATION OF CHARLES E. HAYWARD</u>

I, Charles E. Hayward, pursuant to 28 U.S.C. § 1746 do hereby state the following under penalty of perjury:

1.     I am the Director of the Delaware Division of Child Support Enforcement ["DCSE"] and have held the position since January 2001. DSCE is a division of the Department of Health and Social Services ["DHSS"].

2.     DCSE is by statute mandated to secure the financial security of children by locating absent parents, establishing paternity, seeking, maintaining and enforcing child and medical support orders. DCSE has approximately 214 employees of all colors, creed, races and genders. I am an African American male.

3.     I have the sole authority within DCSE to authorize hiring, promote, demote, suspend and discipline employees of the Division and only the Secretary of DHSS has the authority to terminate an employee.

4.     I have personal knowledge as to the plaintiff, Jacqueline D. Berry (an African American female), while she was employed a DCSE. Ms. Berry was not subjected to any nature of discrimination nor was she subjected to retaliation. Ms. Berry's work performance problems were the result of her missing a great deal of work time and her own work place attitude.

5.      Regarding plaintiff's claims as to her symptoms of carpal tunnel syndrome, typing on a computer keyboard while speaking on the telephone are essential qualifications for her duties as Child Support Specialist within the Consumer Service Unit.


\_\_\_\_\_/s/ Charles E. Hayward\_\_\_\_\_
Charles E. Hayward, Director
Division of Child Support Enforcement